Justice Laurie McKinnon delivered the Opinion of the Court.
***35 ¶1 A jury in the Twenty-Second Judicial District Court, Big Horn County, convicted *422 Brian David Laird (Laird) of deliberate homicide. The District Court sentenced Laird to incarceration for 100 years with no time suspended. Laird appeals. He raises three issues, which we restate as:
1. Did the fifteen-year preaccusation delay unconstitutionally prejudice Laird?
2. Did the State present sufficient evidence in its case-in-chief to overcome Laird's motion to dismiss for insufficient evidence?
3. Did the District Court abuse its discretion by admitting statements a forensic pathologist made while he performed the autopsy when he was unavailable to testify at trial?
¶2 We conclude the fifteen-year preaccusation delay did not unconstitutionally prejudice Laird and determine the State presented sufficient evidence in its case-in-chief to overcome Laird's motion to dismiss for insufficient evidence. We further conclude, however, that the District Court abused its discretion by admitting the unavailable pathologist's statements. We therefore reverse this case on issue three and remand the case to the District Court for further proceedings consistent with this Opinion.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 In the early-morning hours of July 31, 1999, Kathryn Laird drowned in the afterbay area of the Yellowtail Dam of the Bighorn Canyon National Recreation Area. The circumstances surrounding Kathryn's death were suspicious, and a criminal investigation ensued. Fifteen years later, in September 2014, the State charged Kathryn's husband, Laird, with deliberate homicide for Kathryn's death. Following a one-week trial, a jury found Laird guilty.
¶4 Kathryn grew up in Texas, where she and her siblings spent many hours swimming in their backyard pool. She had extremely poor eyesight and could not see without her glasses or contact lenses. Kathryn met Laird in college and they eventually married in February 1999. Kathryn had a dog, Ralphie, who she adored. In July 1999, the couple lived in a trailer park in Fort Smith, Montana, near the afterbay area of the Yellowtail Dam. A walking trail ran from the ***36 trailer park down to the afterbay area. Laird worked as lawyer in Billings and also worked as a fishing guide out of Fort Smith. Kathryn worked multiple jobs in the Fort Smith area. In the mornings, she worked with Greg Heidrich (Heidrich) at Quill Gordon's, a fly and tackle shop, where she set out a continental breakfast for fishing guests. In the evenings, she worked for Tanya Warren (Warren) at Bighorn River Country Lodge, a fishing lodge, where she provided the guests' dinner. Kathryn also periodically drove shuttles for fishing guests.
¶5 During its case-in-chief, the State questioned numerous witnesses who testified that Kathryn was unhappy in the days leading up to her death and that Laird and Kathryn argued throughout the day on July 30, 1999. A few days before Kathryn died, she spoke with her mother, Mary Lou, on the phone. Kathryn was upset and crying during their conversation. Kathryn also spoke with her brother around that time, and she was distraught and crying during their conversation as well.
¶6 In the afternoon on July 30, 1999, Don Lyman (Lyman) saw the Lairds arguing outside of their trailer home. Laird chased Kathryn around the yard, smacked her in the head with a plastic bag filled with cookies, and repeatedly said something along the lines of, "You bitch, you burnt my fucking cookies." Later that day while Kathryn was at work, Warren, Kathryn's boss at her evening job, observed a second heated conversation between Laird and Kathryn. Warren's husband eventually asked Laird to leave; Laird complied. Kathryn worked late that night, leaving after 11:00 p.m.
¶7 Kathleen and Eric Anderson (the Andersons) spent their weekends recreating on the water around Fort Smith. When they were in town, the Andersons stayed in a camper that was parked on a lot near the Lairds' trailer and near the walking trail that ran from the afterbay to the trailer park. They overheard the Lairds arguing over the course of several weekends before Kathryn's death. Kathleen took a shower close to midnight *423 on July 30, 1999, and could clearly hear the couple arguing in raised voices through the vent in the shower ceiling. A male voice stated, "You fucking bitch," over and over again, while a crying female voice repeated, "No, no, no." The argument went on the entire time Kathleen was in the shower, but then suddenly completely stopped. Eric also heard the Lairds arguing that night.
¶8 Shortly after the argument ended, the Andersons heard a vehicle start. They looked outside and saw a person slowly driving the Lairds' white SUV, known by most to be Kathryn's car, by their camper and out of the neighborhood. Kathleen observed that the driver was a man. Eric assumed the driver was male because the person driving was ***37 large. Thankful it would finally be quiet because the man had driven away, the Andersons went to sleep. However, between 45 minutes and an hour later, the Andersons' daughter's dog, which was tied up outside, started barking loudly and became very upset. There was an open area between where the dog was tethered and the walking path that led down to the afterbay, and the dog was barking in the open area's direction. The dog was known to be very aggressive towards males, even male members of the Andersons' family.
¶9 Laird did not testify at trial, but a few years after Kathryn died, Laird applied to practice law in Missouri. The Missouri Board of Law Examiners (Board) questioned Laird about the circumstances surrounding Kathryn's death. Laird answered the questions under oath and, accordingly, the State read the transcript from that questioning into evidence at trial. When asked whether he and Kathryn verbally argued during their marriage, Laird told the Board that Kathryn was "argumentative during her premenstrual time." Laird classified their disagreements as Kathryn being argumentative with him, not the other way around, and further testified that they never had any physical confrontations.
¶10 Laird explained the circumstances surrounding Kathryn's death, specifically his perception of the events on the night of July 30, 1999, to the Board. He was supposed to go to Billings the next morning to do law work and wanted to get rest before making that trip. Kathryn came home from work later than normal that evening and the two got into a discussion around 11:30 p.m. It was "during her premenstrual period" so "she was very tired and very grouchy." Laird told Kathryn that she should quit her morning job, because the money she made was not worth her having to wake up so early, at 4:30 or 5:00 a.m., and being so tried. Kathryn "wanted to argue" about her morning job and "things in general," but Laird wanted to go to sleep. The two argued for ten or fifteen minutes, Laird "refused to have an argument because it was a small point and it was late at night and [he] had to go to Billings" the next day.
¶11 Before the couple moved to Fort Smith, Laird would sleep in his car near the afterbay if he had to guide the next day. To avoid the argument that night, Laird got in his car, drove to that spot near the afterbay, and went to sleep. He awoke to Kathryn knocking on his car window; she was "furious" Laird decided to go sleep in his car. He told her to let him go back to sleep, but she refused, saying that she wanted to fight. They eventually agreed to not fight and to go back to the trailer together. They each drove a car back to the trailer; Laird arrived first and went to bed. Kathryn got to the trailer about twenty ***38 minutes later, and was "going all around" the trailer, slamming drawers. Laird told Kathryn to calm down and asked her what the problem was. She was very upset, would not say what was wrong, and kept slamming things around and digging through drawers. She was acting "like a mad woman"; Laird told her to settle down. Kathryn suddenly stormed out of the trailer, telling Laird to "take care of Ralphie." Laird fell asleep; he assumed Kathryn had cooled off and then come home.
¶12 The next morning, July 31, 1999, Kathryn did not show up for work at Quill Gordon's. Heidrich, Kathryn's co-worker, called the Lairds' trailer looking for Kathryn. The phone rang, but no one answered it. Heidrich waited a few minutes and called a second time. Laird groggily answered. Heidrich asked if something was wrong with Kathryn, Laird replied, "No, she's at work," and *424 Heidrich responded that she was not. Heidrich called his girlfriend, asked for her help setting out breakfast, and briefly left work to go pick her up. As he drove back to work around 6:30 or 7:00 a.m., he saw Laird driving away from the afterbay towards his trailer.
¶13 Warren was in bed sleeping that morning, when a knock at the door awakened her. By the time she got out of bed, Laird was already standing in the kitchen. Laird asked Warren if Kathryn was there, and Warren responded that she was not. Laird angrily reported that Kathryn's morning job had called and said she did not show up, so he was looking for her. Laird left immediately after speaking with Warren, and Warren began to prepare breakfast for the fishing guests. Warren became worried, however, and called Laird to see if he had found Kathryn. He had not, but said he had gone down to the afterbay and that Kathryn's car was parked there.
¶14 Warren finished serving breakfast and called Laird for an update. He reported that Kathryn was still missing. Warren decided to go look for Kathryn and drove to the Lairds' trailer, where she found Laird sitting in the rocking chair on the porch. Laird reported that when Kathryn got home the night before, she took a shower and then initiated an argument with him. Laird told Warren a similar version of events that he later told the Board: that he did not want to argue with Kathryn and, therefore, went to the afterbay to sleep in his car. Kathryn followed him to the afterbay; the two eventually went home, where the argument continued. Laird reported that Kathryn eventually said, "I'm going to kill myself, take care of Ralphie," and left.
¶15 Warren got in Laird's car, and the two began to search for Kathryn. Laird drove to Kathryn's car in the afterbay parking lot.
***39 Warren got out of Laird's car, approached Kathryn's car, opened the door, and noticed Kathryn's purse and keys were in the car. After looking in Kathryn's car, Warren went back to Laird's car and asked him if he was going to get out and help her look for Kathryn. Laird got out of his car and walked around, slowly dragging his feet and not putting much effort into any type of search. They decided to go look elsewhere, and when Warren asked Laird if they should lock Kathryn's car to protect Kathryn's purse, Laird replied that they should not, because then Kathryn would not be able to access the vehicle. Laird did, however, take his fishing rods out of Kathryn's car.
¶16 The two left the parking lot and Laird drove them around while they looked for Kathryn. They got out of the car again at a different parking area, where Warren loudly yelled Kathryn's name, while Laird shuffled around and repeated Kathryn's name quietly. They eventually went back to Laird's trailer, where Laird called 911 at Warren's insistence. Warren later described Laird as angry and worried. Warren also noticed that all of the photographs had been turned down at the trailer. After Laird called 911, Warren left the trailer and proceeded to ask various people if they had seen Kathryn-no one had.
¶17 Warren began to think of all the places that she and Laird searched, and realized that they had not searched one parking area, the "overflow" parking lot near the afterbay. While driving over a bridge, Warren stopped her car to look over toward the overflow parking lot. From there, she could see something floating on the water's surface. It looked like some sort of air bubble from that distance. Warren then drove down to the overflow parking lot, where she could see that it was Kathryn's body floating in the water, face down. Realizing Kathryn was floating face down and therefore no longer alive, Warren drove to her friend's home and asked her to call 911. Dispatch said Officer Morrison was already at the Lairds' trailer, so Warren drove over there. Ranger Bredow also responded to Laird's emergency call, and she arrived at the Lairds' trailer just after Warren. When Warren arrived, she said that she found Kathryn in the water near the overflow parking lot.
¶18 Laird jumped into his car and raced off. Warren followed in her own car, as did Officer Morrison and Ranger Bredow. Laird arrived at the overflow parking lot first and pulled Kathryn's body partially out of the water onto her back. That area of the afterbay was shallow and the shoreline was rocky.
*425 Laird was wailing and crying over Kathryn's body-officers had to physically remove him from Kathryn's body. Kathryn was wearing gray sweatpants, which were at the bikini line in front and exposing half of her buttocks in back. She was wearing a ***40 bra and a button-up shirt, with only one or two buttons buttoned at the top. She also had on earrings, a ring, and a wristwatch. Kathryn was not wearing shoes, socks, contact lenses, or glasses.
¶19 FBI Agent Jackson arrived at the scene and noticed there were a number of different law enforcement officers representing a variety of different agencies. The officers had an impromptu meeting to discuss the situation; Agent Jackson took an informal investigatory lead. Laird willingly spoke with Agent Jackson about the events that had transpired the night before. Laird told Agent Jackson the same story he told Warren and later told the Board: he and Kathryn argued when she got home from work around 11:30; he left to sleep in his car in the afterbay parking lot; he awoke when Kathryn showed up wanting to continue the argument; she drove away; he left as well, going home where he arrived before Kathryn; he laid down; Kathryn arrived about fifteen minutes later and made a lot of noise, wanting to argue more; Kathryn eventually left, slamming the door behind her.
¶20 Laird and Warren eventually left the overflow parking area in their own vehicles. Warren picked up one of her friends and they went to the Lairds' trailer to check on Laird. Laird was agitated and commented to Warren, "I'm bad. I'm bad. I never should have left her." Warren stayed with Laird until his friend, Russell Renner (Renner), arrived. Awhile later, Warren and her husband drove Laird to the hospital in Hardin to help Laird calm down. They dropped Laird off at the hospital, went to the store, and returned to pick Laird up. Laird reported that there was not a doctor available to see him and that he did not want to wait for one. On the way back to Fort Smith, Laird asked to stop the car so he could use the restroom. When he got back into the car, he asked Warren and her husband, "So, what do you guys think?" Warren described Laird's demeanor as inquiring, matter-of-fact-he did not appear upset. They dropped Laird off at his trailer when they got back to Fort Smith.
¶21 That afternoon, Laird called Kathryn's mother, Mary Lou, and informed her that Kathryn died. Mary Lou and Kathryn's sister, Sheri, immediately booked airline tickets to Montana. They arrived in Billings at 2:00 a.m. on August 1, 1999 and went to Fort Smith in the morning. Laird's family also made their way to Fort Smith. Mary Lou and Sheri went to the Laird's trailer. Both women noticed a pair of jeans, wet from the knee down, hanging over the bathtub. They also noticed Laird's mother pick up a second pair of wet jeans from the hallway floor. Laird grabbed the jeans out of his mother's hands, angrily telling her to put the jeans down, that those were the jeans he was wearing when he pulled Kathryn's body from the water. Mary Lou ***41 learned Laird planned to cremate Kathryn, but asked if he would let her take Kathryn's body back to Texas for a funeral. Laird angrily insisted on cremation, but Mary Lou hired an attorney to prevent as much, knowing Kathryn would not have wanted to be cremated. The family eventually held a funeral service in Texas, where Kathryn's family laid her to rest. Laird left Montana a few days after Kathryn's death.
¶22 The county coroner, Terry Bullis (Bullis), also responded to the overflow parking lot shortly after Kathryn's body was found. Bullis transported Kathryn's body to the mortuary in Hardin and contacted Dr. Mueller, a forensic pathologist, to arrange an autopsy. Before Dr. Mueller performed an autopsy, Bullis drew Kathryn's blood for toxicology testing and embalmed her body. Bullis testified that embalming may cause bruises to become darker-more prominent-but will not cause them to appear larger. Bullis noticed bruises on Kathryn's hands, right thigh, arms, the top of her feet.
¶23 On August 1, 1999, Dr. Mueller performed an autopsy on Kathryn's embalmed body. Bullis and Agent Jackson both attended the autopsy. Agent Jackson documented each photograph taken during the autopsy. Dr. Mueller observed bruises around Kathryn's neck he contemporaneously described as "troubling." Dr. Mueller asked Dr. Bennett, *426 another forensic pathologist, to join him for a second autopsy later that day. Agent Jackson attended the second autopsy as well. Dr. Bennett also observed the bruises on Kathryn's neck. In his portion of the autopsy report, Dr. Bennett noted, "Internally, the neck bruises overlaid prominent dark red-violet fresh bruising into both sternocleidal mastoid muscles, which in my opinion was clearly real and premortem." Dr. Bennett further noted the bruising "appeared to be fresh," but decided to excise the bruised tissue for microscopic examination. Bullis filled out Kathryn's death certificate, on which he indicated that Kathryn's "immediate cause" of death was "asphyxia by drowning" and that her "manner of death" "could not be determined."
¶24 Agent Jackson continued to investigate the circumstances surrounding Kathryn's death, seeking information from any potential witnesses. Agent Jackson did not, however, speak with the Andersons (the Lairds' neighbors who heard the couple fighting on the night of July 30, 1999). On August 2, 1999, Agent Jackson and Assistant Chief Ranger Ryan executed a search warrant on Laird's trailer. Ranger Ryan recalled seeing a pair of wet-looking jeans in the hallway. Agent Jackson seized a pair of jeans that were hanging on the side of the bathtub.
¶25 On August 6, 1999, Agent Jackson received a note from Ranger ***42 Ryan. The note read, in part, "Josh Anderson, who works at [the marina], stated that his parents ( [Eric and Kathleen Anderson] ) heard an argument going on at Trailer #9 the night of July 30th. [The Andersons] live right across the alley on B Street in the Trailer Court." The note provided the Andersons' Fort Smith and out-of-town phone numbers. Agent Jackson enclosed the note in an envelope, and the envelope remained with the case file. Kathleen Anderson later testified she spoke about the Lairds' late-night July 30, 1999 argument with a male ranger during the day on July 31, 1999, but thereafter did not speak about Kathryn's death with any law enforcement officers until the summer of 2012. Eric Anderson testified he did not speak with any law enforcement officers about Kathryn's death until the summer of 2012. In 2004, Agent Jackson received a promotion and transferred to FBI headquarters. The case remained open.
¶26 In 2012, another FBI agent reviewed the case file and noticed Ranger Ryan's August 6, 1999 note about the Lairds' late-night argument the Andersons overheard. The agent interviewed the Andersons in the summer of 2012, and the case subsequently gained traction-the authorities had renewed reason to suspect Laird killed Kathryn.
¶27 In September 2012, the FBI contacted Mark Majerus (Majerus), a biologist who specialized in identifying grasses. Majerus examined the sweatpants Kathryn was wearing when her body was found in the afterbay. At trial, Majerus testified he found two species of grass on Kathryn's sweatpants: (1) needle and thread, and (2) cheatgrass. Majerus found some grass on the inside of the pants near the waistband. He explained that the tallest of the grasses grew to about 36 inches under ideal growing conditions. Majerus also explained that the pieces of grass on Kathryn's sweatpants included parts of the plants that do not simply fall off-those parts would have only come off if some sort of force was applied to the plants. In 2012, Majerus visited the overflow parking lot area of the afterbay where Kathryn's body was found. He observed needle and thread and cheatgrass on the slope between the parking lot and the water. Majerus opined that the vegetation in the area was likely very similar in 2012 to how it was in 1999.
¶28 After reviewing all of the case information and gathering the Andersons' statements and Majerus's grass studies, the State formally charged Laird with deliberate homicide in September 2014. Laird pleaded not guilty and the case moved towards trial. Before trial, Laird filed a motion to dismiss for preaccusation delay, arguing the fifteen-year delay between Kathryn's death and the official accusation ***43 violated his due process rights. The District Court reserved its ruling on Laird's motion.
¶29 The State presented the testimony of seventeen witnesses during its case-in-chief: Mary Lou, Kathryn's mother; Sheri, Kathryn's sister; Thomas, Kathryn's brother; Lyman, who witnessed the argument between *427 Laird and Kathryn in the afternoon of July 30; Heidrich, Kathryn's co-worker who called Laird when Kathryn did not come to work on the morning of July 31; Warren, Kathryn's boss who witnessed an argument between Laird and Kathryn at work the night of July 30, searched for Kathryn with Laird on the morning of July 31, and found Kathryn's body; Eric and Kathleen Anderson, who heard the Lairds arguing on the night of July 30 and watched a large figure drive away in a white SUV; Officer Morrison, who first responded to Laird's 911 call and met Laird at the trailer; Ranger Ryan, responding and investigating ranger; Agent Jackson, FBI responder and lead investigator; Bullis, coroner; Majerus, botanist; and four other individuals who were familiar with Kathryn, the afterbay area, and/or the investigation.
¶30 The State did not, however, present testimony from Dr. Mueller or Dr. Bennett, the forensic pathologists who performed the autopsies on Kathryn's body, during its case-in-chief. Dr. Mueller died before Laird's 2016 trial. The State did not call Dr. Bennett. The State claimed that, in 2012, investigators interviewed Dr. Bennett who recalled injuries to Kathryn's neck and opined that Kathryn was strangled and throttled. However, Dr. Bennett subsequently changed his opinion regarding Kathryn's injuries and, in 2016, observed one premortem injury to Kathryn's hand and no other incapacitating premortem injuries. The State attributed Dr. Bennett's change of opinion to the fact that, in 2015, the State of Montana stopped contracting with Dr. Bennett to perform its autopsy work.
¶31 Instead, the State introduced evidence of Dr. Mueller's autopsy and the appearance of Kathryn's postmortem body though the testimony of Bullis, Agent Jackson, and Kathryn's family members. The State sought to admit some statements Dr. Mueller made during the first autopsy through Agent Jackson. Agent Jackson explained the tone of Dr. Mueller's autopsy changed when Dr. Mueller observed the condition of Kathryn's neck. Agent Jackson testified that "Dr. Mueller pointed to multiple areas of hemorrhaged blood in the muscles of Kathryn's neck and said, 'This is troubling.' He said it repeatedly." Laird objected to Agent Jackson's recitation of Dr. Mueller's "troubling" statements on hearsay and confrontation grounds. The District Court overruled the objection, permitting Agent Jackson to testify about ***44 Dr. Mueller's "troubling" statements not for the truth of the matter they asserted-that the hemorrhaged blood in Kathryn's neck muscles was troubling-but instead for the limited purpose of explaining what Agent Jackson did next in his investigation.
¶32 When the Board questioned Laird about the circumstances regarding Kathryn's death, the Board and Laird discussed Dr. Mueller's autopsy findings. The District Court, accordingly, excluded portions of the conversation discussing Dr. Mueller's findings from the transcript it allowed the State to read at trial. The State, however, inadvertently read a portion of Dr. Mueller's findings to the jury: The forensic pathologist's "opinion was Kathryn Laird died of asphyxia by drowning, she sustained a bruise to the left thumb at least several hours before her death, multiple scattered bruises to back and extremities around the time of death and recent unusual bruises of muscle of neck." Laird objected. The District Court instantaneously provided a curative jury instruction: "[W]e've not had the testimony from any pathologist at this point and so that opinion is not properly before you and you are not to consider it...." The State replied, "I didn't see the line, Your Honor. Forgive me."
¶33 The State also sought to admit some photographs of the state of Kathryn's body at the autopsy through Agent Jackson. Agent Jackson testified the photographs accurately depicted the physical condition of Kathryn's body during the first autopsy. Laird objected to the photographs' admission, arguing the State did not have adequate foundation to admit the photographs because it was not presenting testimony from a medical examiner and that, even if proper foundation existed, the photographs were more prejudicial than probative, especially because Bullis embalmed Kathryn's body before the autopsy and photographs. The District Court overruled Laird's objection, allowing the State to *428 admit the photographs through Agent Jackson.
¶34 At the close of the State's case-in-chief, Laird again moved for dismissal based on preaccusation delay, arguing he was most prejudiced by Dr. Mueller's death. Laird argued that, because Dr. Mueller had passed away during the delay, he did not now have the opportunity to cross examine Dr. Mueller regarding his "troubling" statements. The District Court again reserved its ruling on the preaccusation delay issue, noting it could not determine how prejudicial Dr. Mueller's death was until the trial concluded. Laird also moved for dismissal based on insufficient evidence, arguing the State failed to prove that a criminal act caused Kathryn's death. The District Court denied the motion, concluding the State presented evidence upon which a rational trier of fact could find Laird purposely or knowingly ***45 caused Kathryn's death.
¶35 Laird questioned two witnesses during his case-in-defense: Agent Jackson and Dr. Bennett. Agent Jackson's testimony was minimal; he laid the foundation for some photographic evidence, including photographs of a note Laird wrote to Kathryn on the back of an envelope postmarked July 15, 1999, which stated, in part, "I am sorry we have been fighting. I know you work hard [and] are helping a lot. I really appreciate all you do for me. I hope you have a great day."
¶36 At the start of his testimony, Dr. Bennett explained the complex phenomenon of freshwater drowning. He observed that Kathryn's body had bruising, but concluded most of the bruises occurred postmortem. He came to that conclusion after microscopically examining tissue samples excised from the bruised areas. He explained how, if tissue is injured prior to death, it will show microscopic evidence of vitality-that is, evidence of an inflammatory response. The only bruise that showed signs of vitality was the bruise on Kathryn's thumb. When asked about the internal bruising observed in Kathryn's neck area-the same bruising Dr. Mueller described as "troubling" and Dr. Bennett noted on his report as "real and premortem"-Dr. Bennett explained that type of bruise-looking injury can occur from the drowning or autopsy processes. In Dr. Bennett's opinion at trial, Kathryn's neck injury occurred postmortem. He testified that, while the bruising may have initially suggested strangulation or some other premortem-incapacitating injury, those conclusions were not ultimately supported by the microscopic analysis.
¶37 On cross-examination, the State sought to impeach Dr. Bennett's credibility. It began by asking, in front of the jury, whether he was once a pathologist in Iowa. Laird objected, the State responded, "His credibility is clearly at issue here about his diagnosis of causation of death." The District Court excused the jury and heard arguments from the parties regarding the State's attack on Dr. Bennett's credibility. The State asserted it could impeach Dr. Bennett's credibility because he asserted an expert opinion regarding Kathryn's cause of death. The State further stated that, in 1997, Dr. Bennett resigned as a medical examiner in Iowa because of misdiagnosis; in a 2012 interview with detectives, Dr. Bennett opined Kathryn was strangled and throttled; and in 2015, the State told Dr. Bennett he could no longer perform autopsies in Montana. The State attributed Dr. Bennett's change in opinion between 2012 and the trial to the fact that the State terminated its contract with him.
¶38 The District Court decided the State could perform a limited challenge to Dr. Bennett's credibility. Back in front of the jury, the ***46 State asked Dr. Bennett whether the State terminated his services. Dr. Bennett stated he was never the State's employee and, therefore, he could not have been terminated. The State rephrased its question: "Between 2012 and today's date, ... were you either terminated, not rehired, or unappointed as an assistant state medical examiner?" Dr. Bennett responded, "I don't even know unappointed, what it was." The State pushed, "It's a yes or no." Dr. Bennett replied, "I was never appointed, so I guess if I was never appointed-even your office testifies I was never appointed prior to-." The State cut him off, "Nothing further, Your Honor."
¶39 After the defense rested, the parties presented their closing statements to the jury. In its closing statement, the State discussed Dr. Mueller's "troubling" statements.
*429 The State reminded the jury that, through Agent Jackson, it learned that:
Dr. Mueller initially indicated that Kathryn Laird's death in the afterbay appeared nothing other than a simple drowning. That's how it began. That is until he got to the internal exam of Kathryn Laird's neck, inside. When doing this, Dr. Mueller pointed out the extensive hemorrhaging in her neck, in and around the sternocleidal mastoid muscles and longus colli muscles. He then expressed a wholly new reaction to what he had been seeing. It was troubling. An impression he repeated numerous times. That reaction changed the entire course of the investigation. From that point, Brian Laird was the one and only suspect.
¶40 The jury found Laird guilty of deliberate homicide. After trial, Laird renewed his motion to dismiss for preaccusation delay. The District Court ultimately denied the motion, explaining its reasoning in a post-trial order. The District Court sentenced Laird to incarceration for 100 years with no time suspended. Laird now appeals his conviction, arguing three distinct issues, which we address in turn.
STANDARDS OF REVIEW
¶41 A preaccusation delay issue presents a question of constitutional law, which we review de novo. State v. Passmore , 2010 MT 34, ¶ 23, 355 Mont. 187, 225 P.3d 1229.
¶42 We also review a district court's denial of a motion to dismiss for insufficient evidence de novo. State v. McAlister , 2016 MT 14, ¶ 6, 382 Mont. 129, 365 P.3d 1062.
¶43 We review a district court's evidentiary rulings for an abuse of discretion. State v. Colburn , 2018 MT 141, ¶ 7, 391 Mont. 449, 419 P.3d 1196.
***47 DISCUSSION
¶44 1. Did the fifteen-year preaccusation delay unconstitutionally prejudice Laird?
¶45 A criminal defendant has the constitutional right to a speedy trial. Mont. Const. art. II, § 24 ; U.S. Const. amends. VI, XIV. The right applies once a defendant has been indicted, arrested, or otherwise accused of a crime. Passmore , ¶ 25. The constitutional right does not apply to the time between the crime's commission and the official accusation. Passmore , ¶ 25. Instead, other mechanisms "guard against long delay during the preaccusation period." Passmore , ¶ 25.
¶46 The primary guarantee that protects defendants from the state bringing overly stale criminal charges is the applicable statute of limitations. Passmore , ¶ 26. A statute of limitations sets forth a fixed period of time within which a person may be prosecuted following the commission of a crime. Passmore , ¶ 26. Statutes of limitations balance the relative interests of the state in administering justice and the defendant in receiving justice. Passmore , ¶ 26 (citing United States v. Marion , 404 U.S. 307, 322, 92 S. Ct. 455, 464, 30 L.Ed.2d 468 (1971) ). There is no statute of limitations for deliberate homicide in Montana and, accordingly, the applicable statute of limitations does not bar the State's deliberate homicide prosecution of Laird. See § 45-1-205(1)(a), MCA.
¶47 The Due Process Clause also plays a limited role in guarding against oppressive preaccusation delay. Passmore , ¶ 27 (citing United States v. Lovasco , 431 U.S. 783, 789, 97 S. Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) ). A court must dismiss a "prosecution where compelling the defendant to stand trial (even though the statute of limitations has not yet run) would violate those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." Passmore , ¶ 27 (internal quotations and citations omitted).
¶48 When a defendant moves to dismiss a case for unconstitutional preaccusation delay, he must first meet the heavy burden of showing the delay actually, substantially prejudiced him. Passmore , ¶ 28. He must present proof that is definite and not speculative or presumed. Passmore , ¶ 28. The prejudice must amount to the type of deprivation that impairs the defendant's right to a fair trial. It is "commonly demonstrated by the loss of witnesses or physical *430 evidence or the impairment of their use (e.g., dimming of a witness's memory)" or by "the defendant's inability to assist in his own defense." Passmore , ¶ 28. The defendant must prove the loss of a witness or evidence and then ***48 demonstrate how that loss is prejudicial to his case-that is, "how the loss actually impaired his ability meaningfully to defend himself." Passmore , ¶ 28 (internal citations and quotations omitted).
¶49 If the defendant makes a showing of actual, substantial prejudice from the delay, the state must then provide its reasons for the delay. Passmore , ¶ 29. The court will weigh the defendant's prejudice and the length of the delay against the state's justification for the delay. Passmore , ¶ 29. If the defendant's prejudice and the length of delay outweigh the state's justification, compelling the defendant to stand trial violates his due process rights. Passmore , ¶ 29. However, even if the actual prejudice is great, a court may only dismiss the case if there exists some culpability on the government's part. Passmore , ¶ 29. Intentional and reckless state actions causing delay strongly favor dismissal, while a court weighs negligent conduct less heavily. Passmore , ¶ 29.
¶50 Before trial, Laird filed a motion to dismiss for preaccusation delay, arguing the fifteen-year delay between Kathryn's death and the official accusation violated his due process rights. The District Court ultimately denied Laird's motion. On appeal, Laird asks us to reverse the District Court's ruling and dismiss the prosecution. He argues the State violated his due process rights by waiting fifteen years after Kathryn's death before it prosecuted him for deliberate homicide. He contends he can meet the heavy burden of proving the delay caused him to suffer actual, substantial prejudice. Laird further reasons the actual prejudice he suffered, combined with the length of the delay, outweighs the State's justification for the delay. The State responds, arguing Laird failed to meet his heavy burden of proving the delay caused him to suffer actual, substantial prejudice, and that, even if he did meet the burden, the State's justifications for the delay outweigh any prejudice Laird suffered.
¶51 We first consider whether Laird suffered actual, substantial prejudice from the State's delay, as evidenced by definite, nonspeculative proof. Laird argues he was prejudiced-as in, his right to a fair trial was impaired-by the death of two witnesses (Dr. Mueller and Renner) and by the loss of physical evidence (tissue samples).
¶52 First, Laird asserts Dr. Mueller's death prejudiced him. The District Court permitted the State to present Dr. Mueller's "troubling" statements regarding Kathryn's neck bruises through Agent Jackson for the limited purpose of explaining the investigation. To establish prejudice, Laird must present definite, nonspeculative proof showing Dr. Mueller's death impaired his ability to meaningfully defend himself. See Passmore , ¶ 28. Laird asserts prejudice based on his ***49 inability to cross-examine Dr. Mueller about his "troubling" statements-that, absent the delay, he would have been able to ask Dr. Mueller about his post-autopsy opinion regarding the hemorrhaging in the neck area. Laird argues:
[T]he prejudice comes from not being able to cross-examine Mueller. Did he make this statement? If so, what did he mean? What was troubling? Was he still troubled when the autopsy was over? Was he still troubled 15 years later? Would he still be troubled if he had read the medical research Dr. Bennett had brought with him to testify? Not being able to cross-examine Dr. Mueller is what caused the prejudice and it impaired Laird's ability to effectively present a defense.
Laird's prejudice argument is a series of questions in which he speculates as to Dr. Mueller's post-autopsy opinions; he does not present any definite evidence showing Dr. Mueller's death impaired his ability to present a meaningful defense. See Passmore , ¶ 28. Dr. Mueller's death only becomes problematic when we examine the District Court's limited admission of Dr. Mueller's "troubling" statements and the manner in which the State utilized those statements throughout trial. See infra ¶ 80. Compelling Laird to stand trial for homicide when the State's only forensic pathologist was unavailable, thus leaving the State without any testimony *431 regarding Kathryn's cause of death, did not prejudice Laird and result in unconstitutional preaccusation delay. If the State had not introduced Dr. Mueller's "troubling" statements and thereafter repeatedly and inappropriately utilized them throughout trial, Dr. Mueller's death-by itself-would not have actually, substantially prejudiced Laird. Accordingly, Laird has not met his heavy burden of showing prejudicial preaccusation delay due to Dr. Mueller's death.
¶53 Second, Laird maintains Renner's death prejudiced him. The record before us contains very little information about Renner. Warren testified Renner was Laird's friend. When Warren and Laird left the overflow parking area where Kathryn's body was discovered and went back to the Lairds' trailer, Warren stayed with Laird until Renner arrived. Renner then stayed with Laird until Warren returned to take Laird to the hospital. Renner passed away before Laird's 2016 trial.
¶54 Laird and the State agree that Renner gave a statement to the FBI in 1999. Laird asserts Renner's statement corroborated his version of the events on the night of Kathryn's death-specifically, the number of trips the Lairds took in and out of the trailer park. Laird claims Renner told the FBI that, the night Kathryn died, Renner saw the Lairds arguing outside, Laird leave in is car, Kathryn follow in her car, ***50 both come back, and then one of the cars leave again. Laird did not, however, provide Renner's FBI statement to the District Court for review and consideration, and also did not provide the statement to this Court. Without Renner's FBI statement, we have no evidence to consider. Laird failed to present definite, nonspeculative proof that Renner's death prejudiced him.
¶55 Third, Laird claims the loss of physical evidence-specifically, tissue samples-prejudiced him. Before trial, Laird tried to find the tissue samples Dr. Bennett excised from Kathryn's bruises. He contacted Yellowstone Pathology Institute looking for the samples, and the Institute said it would notify him if it could locate the samples. Laird never received a notification. On appeal, Laird asserts the tissue samples were lost at the time of trial and argues their loss prejudiced him because of the way the State portrayed Dr. Bennett's use of the samples during its closing argument. The State criticized Dr. Bennett for failing to review the tissue samples during its closing argument, stating, "[Dr. Bennett] comes in 2016 having done no follow-up reports, having not once since that time reviewed any of the evidence or microslides for a second or subsequent time, ...."
¶56 While we are critical of the way the State portrayed other evidence in its closing argument, see infra ¶¶ 78, 80, we cannot find the State's criticism during its closing statement of Dr. Bennett's failure to review the tissue samples prejudiced Laird's right to a fair trial. Laird must show the delay actually, substantially prejudiced him by presenting definite, nonspeculative proof. We cannot rest upon Laird's speculative proof-an assumption that the State's closing statement comment led the jury to discredit Dr. Bennett's opinion of the slides and that a pre-trial review of the slides would have strengthened his credibility-to conclude the purported loss of tissue samples prejudiced Laird's defense.
¶57 Laird has not met his heavy burden of showing actual, substantial prejudice as evidenced by definite, nonspeculative proof. Because Laird did not prove he was actually prejudiced by the delay, we do not address the State's reasons for the delay or perform a balancing inquiry. Compelling Laird to stand trial did not violate the Due Process Clause's fundamental conception of justice that defines our community's sense of fair play and decency. We accordingly affirm the District Court's order denying Laird's motion to dismiss.
¶58 2. Did the State present sufficient evidence in its case-in-chief to overcome Laird's motion to dismiss for insufficient evidence?
¶59 A fundamental principle of the criminal justice system is that the State must prove each element of a crime beyond a reasonable ***51 doubt. State v. Price , 2002 MT 284, ¶ 33, 312 Mont. 458, 59 P.3d 1122 (citing In re Winship , 397 U.S. 358, 363-64, 90 S. Ct. 1068, 1072-73, 25 L.Ed.2d 368 (1970) ("[T]he Due Process Clause protects the accused *432 against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")). If a defendant believes the State failed to present evidence proving every element of the charged crime, he may request the court dismiss the case for insufficient evidence. When considering the defendant's motion, the court will view the evidence in the light most favorable to the prosecution and only dismiss the case if there is not sufficient evidence upon which a rational trier of fact could find all of the essential elements of the charged offense beyond a reasonable doubt. McAlister , ¶ 6 ; State v. Trujillo , 2008 MT 101, ¶ 8, 342 Mont. 319, 180 P.3d 1153.
¶60 Determinations of witness credibility and testimony weight are within the exclusive province of the jury. State v. McWilliams , 2008 MT 59, ¶ 37, 341 Mont. 517, 178 P.3d 121. Conflicting testimony does not render the evidence insufficient to support a guilty verdict; instead, a jury determines which version of events prevails. McWilliams , ¶ 37 ; McAlister , ¶ 12 (citing State v. Trull , 2006 MT 119, ¶ 20, 332 Mont. 233, 136 P.3d 551 ). A jury may consider all direct and circumstantial evidence, as well as any legitimate inferences that may be legally drawn therefrom, to determine a defendant's culpability. State v. Phillips , 147 Mont. 334, 336, 412 P.2d 205, 206 (1966). Circumstantial evidence may prove any element of an offense and sustain a conviction. State v. Hegg , 1998 MT 100, ¶ 13, 288 Mont. 254, 956 P.2d 754. Circumstantial evidence is adequate if, considering all facts and circumstances collectively, it is of such quality and quantity as to legally justify guilt beyond a reasonable doubt when all of the facts and circumstances are considered collectively. State v. Morrisey , 2009 MT 201, ¶ 89, 351 Mont. 144, 214 P.3d 708.
¶61 "A person commits the offense of deliberate homicide if [he] purposely or knowingly causes the death of another human being." Section 45-5-102(1)(a), MCA (1999). Therefore, to survive Laird's motion to dismiss for insufficient evidence, the State's case-in-chief needed to contain sufficient evidence, viewed in the light most favorable to the prosecution, from which a rational trier of fact could find Laird purposely or knowingly caused Kathryn's death beyond a reasonable doubt.
¶62 At the end of the State's case-in-chief, Laird moved to dismiss the case for insufficient evidence. The District Court denied Laird's ***52 request, and Laird appeals that decision. He argues the State failed to prove a criminal act caused Kathryn's death in its case-in-chief, focusing his argument on the lack of physical evidence. Laird reminds us that a person may drown as the result of a criminal action (homicide), but that a person may also drown because of an accident or suicide. Laird contends that, if the State's theory was true-if Laird drug Kathryn from the overflow parking lot, down the embankment, into the water, and caused her death by drowning her-he would have had to incapacitate her before doing so. Laird maintains the State did not provide any physical evidence of Kathryn's incapacity during its case-in-chief. Therefore, Laird argues the State did not prove Kathryn's death was the result of a criminal act. The State responds, arguing the totality of the evidence it presented in its case-in-chief contained sufficient evidence proving Laird caused Kathryn's death.
¶63 Viewing the State's case-in-chief evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could have found Laird purposely or knowingly caused Kathryn's death beyond a reasonable doubt. While the State may not have presented precise physical evidence indicating Kathryn was incapacitated before she died, it did present a multitude of other evidence during its case-in-chief, the quality and quantity from which a rational trier of fact could have concluded Laird caused Kathryn's death beyond a reasonable doubt.
¶64 The State presented the testimony of seventeen witnesses during its case-in-chief. Three of Kathryn's family members testified that Kathryn was unhappy in the days leading up to her death. Lyman testified about the argument he witnessed between Laird and Kathryn outside of their trailer on the afternoon of July 30. Warren testified about the argument she witnessed between Laird *433 and Kathryn while Kathryn was at work on the night of July 30. The Andersons testified about the argument they overheard at the trailer park on night of July 30. The Andersons further testified that the argument stopped suddenly and that, a few minutes later, they saw a large person driving the Lairds' white SUV away.
¶65 Heidrich testified that Kathryn did not come to work on the morning of July 31. Warren testified that Laird came looking for Kathryn and about her and Laird's subsequent search for Kathryn. Laird took Warren to the afterbay parking lot where he found Kathryn's car, but notably did not take Warren to the overflow parking lot where Warren ultimately found Kathryn's body. Officer Morrison, Ranger Ryan, and Coroner Bullis testified about their responses to Laird's 911 call, the state of Kathryn's body when it was found, and the ***53 subsequent investigation. Kathryn's car was found in the afterbay parking lot, not in the overflow parking lot closest to where her body was found. Majerus, the botanist, testified about the grass pieces found in Kathryn's sweatpants, which matched the vegetation on the shoreline near where her body was found. Kathryn was not wearing any shoes when she was found, yet the shoreline was rocky. Kathryn was not wearing contact lenses or glasses when she was found, yet her brother testified that Kathryn had extremely poor eyesight.
¶66 Bullis testified about Dr. Mueller's autopsy. Kathryn's death certificate indicated Kathryn's "immediate cause" of death was "asphyxia by drowning" and her "manner of death" "could not be determined." Agent Jackson testified about the FBI's investigation. A few years after Kathryn's death, Laird applied to practice law in Missouri and told his version of events to the Board; the State read Laird's sworn testimony into evidence at trial. Kathryn's mother and sister recounted seeing two pairs of wet jeans in the Lairds' trailer following Kathryn's death and remembered Laird's reaction to his mother picking up the pair he said he was wearing when he found Kathryn. Laird wanted Kathryn's body cremated immediately, while her family asserted Kathryn's wishes were to be buried. The State questioned four other individuals who were familiar with Kathryn, the afterbay area, and/or the investigation.
¶67 The District Court explained the difference between direct and circumstantial to the jury. It instructed: "Direct evidence is when a witness testifies directly of his or her knowledge of the main fact or facts to be proven. Circumstantial evidence is proof from which the jury may infer other and connective facts which follow according to common experience. Both direct evidence and circumstantial evidence are acceptable as means of proof. Neither is entitled to greater weight than the other."
¶68 While the State did not present forensic evidence proving Kathryn was incapacitated before she drowned, viewing the evidence in the light most favorable to the prosecution, we conclude the State presented sufficient evidence from which a rational trier of fact could have found Laird purposely or knowingly caused Kathryn's death beyond a reasonable doubt. The State presented enough circumstantial evidence and connective facts from which the jury could have inferred that Laird caused Kathryn's death. We therefore affirm the District Court's decision denying Laird's motion to dismiss for insufficient evidence.
¶69 On appeal, Laird asserts the State's reliance on circumstantial evidence mandates reversal. He claims the State did not prove a ***54 criminal act caused Kathryn's death because it did not provide expert medical testimony regarding Kathryn's cause of death. Citing cases from other jurisdictions, Laird argues the State must present expert medical testimony about the victim's cause of death when the cause of death is not self-evident or where it could be subject to misinterpretation. See, e.g. , United States v. Henderson , 409 F.3d 1293, 1300 (11th Cir. 2005) ; Frutiger v. State , 111 Nev. 1385, 907 P.2d 158, 161 (1995) ; Hicks v. Sheriff , 86 Nev. 67, 464 P.2d 462, 465 (1970) ; Azbill v. State , 84 Nev. 345, 440 P.2d 1014, 1015-19 (1968).
¶70 We have never before required expert medical testimony to establish a victim's cause of death in homicide cases. Instead, our case law reflects the well-established concept that direct and circumstantial *434 evidence exist on equal footing and that circumstantial evidence is sufficient to prove any element of an offense and to sustain a conviction. See, e.g. , Hegg , ¶ 13. We refuse to require expert medical testimony about the victim's cause of death when the cause of death is not self-evident or where the cause could be subject to misinterpretation-requiring as much would elevate direct evidence over circumstantial evidence. In cases like this one, where, viewing the evidence in the light most favorable to the prosecution, there is sufficient circumstantial evidence upon which a rational trier of fact could find the defendant purposely or knowingly caused the victim's death beyond a reasonable doubt, a defendant's motion to dismiss for insufficient evidence will fail, even if the State did not present expert medical testimony regarding the victim's cause of death.
¶71 3. Did the District Court abuse its discretion by admitting statements a forensic pathologist made while he performed the autopsy when he was unavailable to testify at trial?
¶72 The Sixth Amendment's Confrontation Clause, made applicable to state prosecutions via the Fourteenth Amendment, guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amends. VI, XIV ; Crawford v. Washington , 541 U.S. 36, 42, 124 S. Ct. 1354, 1359, 158 L.Ed.2d 177 (2004) (citing Pointer v. Texas , 380 U.S. 400, 406, 85 S. Ct. 1065, 1069, 13 L.Ed.2d 923 (1965) ); see also Mont. Const. art. II, § 24 ("[T]he accused shall have the right ... to meet the witnesses against him face to face."). Thus, many out-of-court statements are inadmissible at trial because admission of such statements evades the Confrontation Clause's basic objective: confrontation. See Crawford , 541 U.S. at 59, 68-69, 124 S. Ct. at 1369, 1374.
¶73 Accordingly, hearsay-"a statement, other than one made by ***55 the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"-is generally not admissible at trial. M. R. Evid. 801(c), 802. However, an out-of-court statement offered to prove something other than the truth of the matter asserted is not hearsay and is, accordingly, generally admissible. "A statement is hearsay only when the immediate inference the proponent wants to draw is the truth of the assertion on the statement's face. If the proponent can demonstrate that the statement is logically relevant on any other theory, the statement is nonhearsay." Siebken v. Voderberg , 2015 MT 296, ¶ 22, 381 Mont. 256, 359 P.3d 1073 (internal citations and quotations omitted); see also State v. Sanchez , 2008 MT 27, ¶ 19, 341 Mont. 240, 177 P.3d 444. "[A] statement offered for the purpose of showing that the statement was made and the resulting state of mind is properly admitted." City of Billings v. Nolan , 2016 MT 266, ¶ 28, 385 Mont. 190, 383 P.3d 219 (quoting Voderberg , ¶ 22 ).
¶74 On appeal, Laird argues the District Court abused its discretion when it allowed Agent Jackson to testify about the "troubling" statements Dr. Mueller made during Kathryn's first autopsy. The District Court found Dr. Mueller's "troubling" statements were probative of what Agent Jackson did next in his investigation, specifically why a second autopsy occurred. Therefore, the District Court allowed Agent Jackson to testify: "Dr. Mueller pointed to multiple areas of hemorrhaged blood in the muscles of Kathryn's neck and said, 'This is troubling.' He said it repeatedly." The District Court permitted Dr. Mueller's "troubling" statements not for the truth they asserted-that the hemorrhaged blood in Kathryn's neck was troubling-but instead to explain how the investigation proceeded.
¶75 Dr. Mueller's "troubling" statements are not hearsay if offered solely to explain the investigation. However, a thorough review of the record convinces us the State utilized Dr. Mueller's "troubling" statements to explain more than just the investigation. Instead, the State clearly sought to have the jury believe Dr. Mueller found Kathryn's neck bruising "troubling"-that is, the State offered the statements for the truth of the matter they asserted and, throughout the trial, developed the idea that Dr. Mueller found Kathryn's neck bruising "troubling."
¶76 In the State's opening statement, it told the jury investigating officers "learn[ed]
*435 through autopsies and such that [Kathryn] had unexplained bruises on her neck and torso." However, the State did not thereafter question any witness who could properly speak about Kathryn's "unexplained" neck bruises. When the State elicited ***56 Dr. Mueller's "troubling" statements from Agent Jackson, it inquired about the statements in the context of Agent Jackson's investigation: "Agent Jackson, so tell us very simply what Dr. Mueller stated while he was observing this condition at the point where the tone of the autopsy changed, that changed your investigation?" Agent Jackson replied, telling the jury what Dr. Mueller said: "Dr. Mueller pointed to multiple areas of hemorrhaged blood in the muscles of Kathryn's neck and said, 'This is troubling.' He said it repeatedly." The State inquired, "[W]ere you aware whether there was a second autopsy conducted?" Agent Jackson replied that he was aware a second autopsy occurred, which he was present for. The State, however, did nothing with that information. It did not call Dr. Bennett, who performed the second autopsy with Dr. Mueller, as a witness. The fact that a second autopsy occurred could have been addressed in a manner that did not involve admission of an accusatory hearsay statement. Instead, the State used Dr. Mueller's statements to highlight Kathryn's neck bruising and to ensure the jury knew the pathologist found the bruising "troubling."
¶77 Exacerbating the error, the State mishandled Dr. Mueller's opinion of Kathryn's bruises when it read Laird's Missouri Bar testimony into the record. The District Court specifically excluded portions of the conversation that discussed Dr. Mueller's findings. The State, however, inadvertently read a portion of Dr. Mueller's findings to the jury: "[T]he forensic pathologist['s] ... opinion was Kathryn Laird died of asphyxia by drowning, she sustained a bruise to the left thumb at least several hours before her death, multiple scattered bruises to back and extremities around the time of death and recent unusual bruises of muscle of neck." Laird objected and the District Court immediately provided a curative jury instruction. The State replied, "I didn't see the line, Your Honor. Forgive me." While the State's error was unintentional, the jury heard again from the State's pathologist, Dr. Mueller, that the autopsy had "troubling" implications because Dr. Mueller found recent, unusual bruises on Kathryn's neck muscle. Yet, Laird had no opportunity to cross-examine Dr. Mueller about the "unusual" bruising. Moreover, the statements pertained to a crucial element of the offense-the cause of Kathryn's death. It was clear that, following Dr. Mueller's "troubling" statements, the focus of the investigation turned to Laird. Through Dr. Mueller's "troubling" statements, the State was able to produce expert testimony as to the cause of Kathryn's death without calling the pathologist himself.
¶78 As the trial proceeded, the State continued to utilize Dr. Mueller's "troubling" statements inconsistently with the limited manner for which the District Court admitted them. In closing arguments, the ***57 State emphasized Dr. Mueller's "troubling" statements: "Dr. Mueller pointed out the extensive hemorrhaging in her neck, in and around the sternocleidal mastoid muscles and longus colli muscles. He then expressed a wholly new reaction to what he had been seeing. It was troubling. An impression he repeated numerous times. That reaction changed the entire course of the investigation. From that point, Brian Laird was the one and only suspect." Instead of using the statements to explain how the investigation proceeded-that a second autopsy occurred-the State used the statements to tell the jury that, after Dr. Mueller noticed the "troubling" neck bruising, the "entire course of the investigation" changed and, thereafter, "Brian Laird was the one and only suspect."
¶79 Further, the State emphasized the extent of Kathryn's bruising when it questioned other witnesses. The State asked multiple witnesses about the state of Kathryn's postmortem body and asked Kathryn's sister if she noticed any bruises on Kathryn's body. We can come to no other conclusion but that the State was trying to make it appear as though the bruising around Kathryn's neck supported its theory that Laird incapacitated Kathryn and drug her down the embankment into the afterbay. The State, however, did not present a forensic pathologist or any other *436 individual qualified to comment on the origin of Kathryn's neck bruising.
¶80 Based on the manner in which the State elicited testimony about Kathryn's bruising from its witnesses and the State's comments about Kathryn's bruising in opening and closing statements, we conclude Dr. Mueller's "troubling" statements were out-of-court statements offered in evidence to prove the truth of the matter asserted-they were hearsay. The State repeatedly presented evidence of Kathryn's "troubling" and "unexplained" neck bruises to the jury, but did not provide a qualified expert's opinion. As hearsay, Dr. Mueller's "troubling" statements were inadmissible. We accordingly conclude the District Court abused its discretion by allowing them into evidence.
¶81 At trial, the State asserted that, if Dr. Mueller's "troubling" statements were hearsay, they were nevertheless admissible because they fell under the present-sense impression hearsay exception. See M. R. Evid. 803(1) (stating a present sense impression-"a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter"-is not excluded by the hearsay rule, regardless of declarant availability). While hearsay is generally inadmissible, certain statements are admissible because they fall under an exception to the general rule. M. R. Evid. 802 - 804. Many hearsay exceptions are ***58 premised upon the logic that the hearsay statements are admissible because the circumstances surrounding the statements establish their reliability. See, e.g. , M. R. Evid. 803(1)-(2). For example, present sense impressions are reliable because "[t]he guarantee of trustworthiness is provided by the spontaneity of the event and the reduced likelihood of deliberate misrepresentation." Commission Comments to M. R. Evid. 803. Many other hearsay exceptions are premised upon the logic that the hearsay statements are admissible because they were prepared for a reason other than in anticipation of litigation and are, therefore, trustworthy. See, e.g. , M. R. Evid. 803(4) (statements for purposes of medical diagnosis or treatment); M. R. Evid. 803(6) (records of regularly conducted activities); M. R. Evid. 803(9) (records of vital statistics); M. R. Evid. 803(11) (records of religious organizations); M. R. Evid. 803(12) (marriage, baptismal, and similar certificates); M. R. Evid. 803(13) (family records).
¶82 The District Court found that Dr. Mueller's "troubling" statements were not hearsay and, accordingly, did not consider any hearsay exceptions. During oral argument before this Court, the State asserted that, if this Court disagreed with the District Court and concluded Dr. Mueller's "troubling" statements were hearsay, we should still affirm the District Court's admission of the statements because the statements were present-sense impressions. The Dissent takes that route, finding the statements were present-sense impressions and determining the District Court correctly admitted them.
¶83 We conclude Dr. Mueller's "troubling" statements remain inadmissible, regardless of whether they fall under the present-sense impression hearsay exception, because the District Court violated Laird's Sixth Amendment right to confront the witnesses against him when it admitted the statements. A hearsay statement is not unquestionably admissible just because it fits into a hearsay exception-the defendant's Sixth Amendment confrontation right remains a fundamental consideration that may not be infringed upon, state evidentiary rules aside. See Melendez-Diaz v. Massachusetts , 557 U.S. 305, 324, 129 S. Ct. 2527, 2539-40, 174 L.Ed.2d 314 (2009). Whether a hearsay statement's admission implicates a defendant's confrontation rights depends on whether the statement is testimonial or nontestimonial. Michigan v. Bryant , 562 U.S. 344, 357-58, 131 S. Ct. 1143, 1155, 179 L.Ed.2d 93 (2011) ; Crawford , 541 U.S. at 68, 124 S. Ct. at 1374. If the hearsay statement is testimonial, the statement's admission implicates the defendant's Sixth Amendment confrontation rights and is only admissible if the declarant is unavailable and if the defendant had a prior opportunity to cross-examine the declarant.
***59 Ohio v. Clark , 576 U.S. ----, ----, 135 S. Ct. 2173, 2179-81, 192 L.Ed.2d 306 (2015) ; Crawford , 541 U.S. at 59, 68, 124 S. Ct. at 1369, 1374.
*437 ¶84 Whether a hearsay statement is testimonial or nontestimonial is a complex legal inquiry, especially in light of the United State Supreme Court Justices' divergent views on the subject. In 2004, the Court decided Crawford v. Washington , in which it listed a "core class of 'testimonial' statements": "ex parte in-court testimony or its functional equivalent," for example, "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford , 541 U.S. at 51-52, 124 S. Ct. at 1364 (internal citations omitted). The Court did not provide a definitive definition of "testimonial," however, instead commenting: "Regardless of the precise articulation, some statements qualify under any definition ...." Crawford , 541 U.S. at 52, 124 S. Ct. at 1364.
¶85 The Court has considered numerous Confrontation Clause issues since Crawford , beginning with Davis v. Washington in 2006. Davis v. Washington , 547 U.S. 813, 126 S. Ct. 2266, 165 L.Ed.2d 224 (2006). In Davis , the Court analyzed hearsay statements made in the context of police interrogations and held that "[s]tatements are nontestimonial when made ... under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis , 547 U.S. at 822, 126 S. Ct. at 2273. Statements are testimonial, however, "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution ." Davis , 547 U.S. at 822, 126 S. Ct. at 2273-74 (emphasis added).
¶86 In 2009, the Supreme Court decided Melendez-Diaz v. Massachusetts , in which it extended Crawford 's holding to forensic reports. In Melendez-Diaz , the Court analyzed whether forensic analysis certificates prepared by analysts who swore to the truth of the reported test results before a notary public-which concluded a tested substance was cocaine-were "testimonial" statements for Confrontation Clause purposes. Melendez-Diaz , 557 U.S. at 307-08, 129 S. Ct. at 2530-31. The Court noted that the certificates fell under Crawford 's "core class ***60 of testimonial statements": they constituted testimony-a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." Melendez-Diaz , 557 U.S. at 310, 129 S. Ct. at 2532 (quoting Crawford , 541 U.S. at 51, 124 S. Ct. at 1364 ). The Court explained:
The fact in question is that the substance found in the [defendant's possession] was, as the prosecution claimed, cocaine--the precise testimony the analysts would be expected to provide if called at trial. The "certificates" are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination."
Melendez-Diaz , 557 U.S. at 310-11, 129 S. Ct. at 2532 (quoting Davis , 547 U.S. at 830, 126 S. Ct. at 2278 ). The certificates were testimonial statements, "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Melendez-Diaz , 557 U.S. at 311, 129 S. Ct. at 2532 (quoting Crawford , 541 U.S. at 52, 124 S. Ct. at 1364 ). Therefore, "[a]bsent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them," admission of the certificates violated the defendant's Sixth Amendment confrontation right. Melendez-Diaz , 557 U.S. at 311, 129 S. Ct. at 2532.
¶87 The Court further reasoned that, while the certificates were potentially admissible under a hearsay exception, the certificates remained inadmissible because they were testimonial hearsay prohibited by the Confrontation Clause. Melendez-Diaz , 557 U.S. at 321-24, 129 S. Ct. at 2538-40. While records kept in the regular course of *438 business are typically admissible under a hearsay exception, see M. R. Evid. 803(6), documents are not admissible under that hearsay exception if the "regularly conducted business activity is the production of evidence for use at trial." Melendez-Diaz , 557 U.S. at 321, 129 S. Ct. at 2538. "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because--having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial--they are not testimonial." Melendez-Diaz , 557 U.S. at 324, 129 S. Ct. at 2539-40. However, the certificates at issue were "prepared specifically for use at ... trial" and, therefore, testimonial and subject to the Confrontation Clause's limitations-regardless of whether the certificates qualified as business records under the hearsay exception. ***61 Melendez-Diaz , 557 U.S. at 324, 129 S. Ct. at 2539-40.
¶88 In 2011, the Court clarified in Michigan v. Bryant that a statement's testimonial status is highly dependent upon the particular circumstances in which the statement was made. See Bryant , 562 U.S. at 358-59, 369, 131 S. Ct. at 1155-56, 1162 (stating that, to determine an interrogation's primary purpose, the Court "objectively evaluate[s] the circumstances in which the encounter occurs and the statements and actions of the parties"). A few months later, the Court decided Bullcoming v. New Mexico , 564 U.S. 647, 651, 131 S. Ct. 2705, 2709, 180 L.Ed.2d 610 (2011), which involved a driving while intoxicated charge. At trial, the prosecution introduced a forensic laboratory report indicating the defendant's blood-alcohol concentration was well above the legal limit when he was arrested. The analyst who prepared the report did not testify at trial; instead, his colleague-who was familiar with the testing procedures but who did not participate in or observe the defendant's blood sample test-testified. Bullcoming , 564 U.S. at 651, 131 S. Ct. at 2709. The Court determined the report's admission violated the defendant's right to confront the witnesses against him because he did not have the opportunity to cross-examine the particular analyst who certified that his blood-alcohol concentration was above the legal limit. Bullcoming , 564 U.S. at 652, 131 S. Ct. at 2710.
¶89 The Court noted that even though the report in Bullcoming was not a sworn declaration like the laboratory certificates in Melendez-Diaz , it was a formalized, signed document aimed at proving a particular person's guilt and, therefore, sufficiently formal to qualify as "testimonial." Bullcoming , 564 U.S. at 664-65, 131 S. Ct. at 2717 (noting that "a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," the analyst tested the evidence and prepared a certificate containing the test results, and the certificate was "formalized" in a signed document). The Court quoted Crawford for the proposition that " 'the absence of [an] oath [i]s not dispositive' in determining if a statement is testimonial." Bullcoming , 564 U.S. at 664, 131 S. Ct. at 2717 (quoting Crawford , 541 U.S. at 52, 124 S. Ct. at 1364 ).
¶90 One year after it decided Bullcoming , the Court decided Williams v. Illinois , 567 U.S. 50, 132 S. Ct. 2221, 183 L.Ed.2d 89 (2012) (plurality). In Williams , a forensic biologist testified that a DNA profile produced in a Maryland laboratory, which was derived from semen on vaginal swabs taken from a rape victim, matched a DNA profile produced in an Illinois laboratory, which was derived from a sample of the defendant's blood.
***62 Williams , 567 U.S. at 59-60, 132 S. Ct. at 2229 (plurality). Five Justices concluded the forensic biologist's testimony was not testimonial evidence, but a single analysis did not garner majority support.
¶91 Justice Alito authored a plurality opinion, in which he and three other Justices concluded the biologist's testimony did not violate the Confrontation Clause on two alternative grounds: (1) the DNA profile evidence was not admitted for the truth of the matter it asserted, but instead admitted for the purpose of explaining how the biologist came to her independent conclusion; and (2) the DNA profile produced in the Maryland laboratory was not prepared "for the primary purpose of accusing a targeted individual," but instead for the primary purpose of finding a dangerous rapist who was still at large.
*439 Williams , 567 U.S. at 57-59, 84, 132 S. Ct. at 2228, 2243 (plurality). Justice Thomas agreed that the biologist's testimony was not testimonial but reasoned that was the case because the Maryland laboratory report "lack[ed] the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact." Williams , 567 U.S. at 111, 132 S. Ct. at 2260 (Thomas, J., concurring in the judgment). Justice Kagan authored a dissent, in which she and three other Justices concluded the biologist's testimony was testimonial and, accordingly, its admission violated the defendant's confrontation right. Williams , 567 U.S. at 140-41, 132 S. Ct. at 2277 (Kagan, J., dissenting).
¶92 Most recently, in 2015,[1] the Court decided Ohio v. Clark , 576 U.S. at ----, 135 S. Ct. at 2177, in which all of the Justices concluded the defendant's confrontation right was not infringed upon. In Clark , a three-year-old boy's preschool teachers noticed injuries on the boy's body and asked him what happened. The boy indicated his mother's boyfriend inflicted the injuries. Clark , 576 U.S. at ----, 135 S. Ct. at 2178. At trial, the prosecution introduced the boy's statements to his teachers into evidence, but the boy did not testify. Clark , 576 U.S. at ----, 135 S. Ct. at 2178. A majority of Justices joined Justice Alito's reasoning in support of the Court's conclusion that the boy's statements were not testimonial.
***63 ¶93 The Clark majority quoted Davis and explained "what has come to be known as the 'primary purpose' test" to determine whether a statement is testimonial: in the context of a police interrogation, statements are nontestimonial if the circumstances objectively indicate that the interrogation's primary purpose is to enable police to meet an ongoing emergency, while statements are testimonial when there is no ongoing emergency and the circumstances objectively indicate that the interrogation's primary purpose "is to establish or prove past events potentially relevant to later criminal prosecution." Clark , 576 U.S. at ----, 135 S. Ct. at 2179-80 (quoting Davis , 547 U.S. at 822, 126 S. Ct. at 2273-74 ). The Clark majority further noted the Bryant Court's "primary purpose" explanation: "[W]hether an ongoing emergency exists is simply one factor ... that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." Clark , 576 U.S. at ----, 135 S. Ct. at 2180 (quoting Bryant , 562 U.S. at 366, 131 S. Ct. at 1160 ).
¶94 The Clark majority went on to describe an "additional factor" courts should consider in determining the statement's primary purpose: "the informality of the situation and the interrogation." Clark , 576 U.S. at ----, 135 S. Ct. at 2180 (internal quotations and citations omitted). A more formal setting-such as a formal station-house interrogation-"is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." Clark , 576 U.S. at ----, 135 S. Ct. at 2180.
¶95 To determine whether a statement is testimonial, "[i]n the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " Clark , 576 U.S. at ----, 135 S. Ct. at 2180 (quoting Bryant , 562 U.S. at 358, 131 S. Ct. at 1155 ); see also State v. Porter , 2018 MT 16, ¶ 19, 390 Mont. 174, 410 P.3d 955. The Court explained, however, that the primary purpose test is not dispositive: "[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial[,]" but the Confrontation Clause does not necessarily bar every statement that satisfies the primary purpose test. Clark , 576 U.S. at ----, 135 S. Ct. at 2180-81. For example, the Confrontation Clause does not bar an out-of-court statement that would have been admissible at the time of the founding. Clark , 576 U.S. at ----, 135 S. Ct. at 2180.
*440 ¶96 This Court applies Clark 's "primary purpose" test to determine whether a statement is testimonial. Porter , ¶ 23. We ***64 recently applied Clark and addressed a Confrontation Clause issue in State v. Porter . In Porter , the State charged the defendant with felony aggravated assault for allegedly strangling his domestic partner, Michelle. Porter , ¶ 1. At trial, the prosecution introduced the testimony of Dr. Tiffany Kuehl, the physician who treated Michelle's injuries. Porter , ¶¶ 2, 7. Dr. Kuehl testified about her examination of Michelle, describing Michelle's physical injuries. Dr. Kuehl further testified about the "verbal history" of the incident that she elicited from Michelle during the examination. Porter , ¶ 8. The doctor testified that, when she asked Michelle what was going through her mind when the defendant was strangling her, Michelle replied that "she felt like she was going to die." Porter , ¶ 10.
¶97 We concluded Dr. Kuehl's statements were not testimonial, reasoning that "the primary purpose of the conversation was not to create an out-of-court substitute for trial testimony." Porter , ¶ 26. In so holding, we noted that a law enforcement officer did not participate in the actual medical exam; Michelle made her statements to a doctor, not a law enforcement officer; and the exam occurred in an emergency room, not a police station. Porter , ¶ 26. We recited as noteworthy Clark 's reasoning that "statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." Porter , ¶ 19 (quoting Clark , 576 U.S. at ----, 135 S. Ct. at 2182 ). We concluded that, based on all of the circumstances, the victim's "primary purpose in speaking with Dr. Kuehl was to receive medical care for her injuries, not to create an out-of-court substitute for trial testimony." Porter , ¶ 26. Accordingly, the statements were nontestimonial, and their admission did not violate the defendant's confrontation rights. Porter , ¶ 26.
¶98 Turning to the facts of this case, we first note the limitations of our current inquiry. We are considering very precise hearsay statements: Dr. Mueller's "troubling" statements, conveying his opinion that Kathryn's neck injuries were "troubling," which he made during the first autopsy performed on Kathryn's body. We are not considering factual statements Dr. Mueller made during the autopsy consisting of straightforward factual observations of Kathryn's injuries. We are not considering whether the admission of some sort of document-such as Dr. Mueller's autopsy report or Kathryn's death certificate-would violate Laird's confrontation right. We do note, however, that the District Court admitted Kathryn's death certificate into evidence but required the State to redact the phrase "unexplained bruises to neck ***65 and trunk" due to confrontation concerns. We are also not considering a situation where a second forensic pathologist looked at autopsy photographs and/or Dr. Mueller's report containing factual observations about the state of Kathryn's body, developed his own expert opinion about Kathryn's injuries, and then testified about any conclusions he was able to draw about the cause of her death. For purposes of a Confrontation Clause analysis, those situations are completely distinguishable from the hearsay statements at issue in this case.
¶99 The hearsay statements presently at issue are Dr. Mueller's "troubling" statements. To determine whether the statements are testimonial, we must closely examine whether, in light of all the circumstances, viewed objectively, the statements' primary purpose was to create an out-of-court substitute for trial testimony. See Porter , ¶¶ 23, 26 ; Clark , 576 U.S. at ----, 135 S. Ct. at 2180.
¶100 After Kathryn's body was discovered in the afterbay and law enforcement began to respond to the scene, Agent Jackson took a lead role in investigating her death. Agent Jackson asked to speak with Laird in order to gather facts about the circumstances surrounding Kathryn's death, and Laird agreed. The two spoke in the afterbay parking lot less than two hours after Agent Jackson responded to the scene. Following his conversation with Laird, Agent Jackson had concerns that "led [him] in the subsequent investigation." Agent Jackson explained at trial: "[W]hen we completed the interview, it was my belief that we needed to do a postmortem *441 examination on Kathryn's body. We had a young, well-educated female who had drowned and there was no ... obvious explanation for the circumstances surrounding her drowning." Because there were unexplained circumstances surrounding Kathryn's death, Agent Jackson decided an autopsy was necessary to determine whether "criminal activity was or was not the cause of the death." Agent Jackson had to request authorization in order to schedule the autopsy because autopsies are expensive; the FBI does not "just do postmortem examinations on every deceased individual.... [It tries] to be judicious about when [it] choose[s] to do [one]."
¶101 Coroner Bullis transported Kathryn's body away from the crime scene. Bullis testified that, because Kathryn's death was "unattended," it was his responsibility as coroner to determine who she was, when she died, where she died and, if possible, how she died. Dr. Mueller performed the autopsy the next day. Agent Jackson, Bullis, and a detective from the sheriff's office were present at the autopsy. Agent Jackson kept a photo log during the autopsy-the other ***66 detective took photographs and Agent Jackson explained each photograph in the log.
¶102 At trial, the State questioned Agent Jackson about the autopsy. It asked, "Was there a point in the autopsy when the tone of the autopsy changed from your perspective?" Agent Jackson replied, "Yes. There was clearly a time when it changed." The State asked, "[D]id Dr. Mueller make any statements to you, describe it or explain any condition of the body while he was perceiving that condition at the time when the tone of the autopsy changed." Laird objected to that question, noting he did not have the opportunity to cross-examine Dr. Mueller and, therefore, a "confrontational issue" existed.
¶103 The District Court ultimately allowed Agent Jackson to recite Dr. Mueller's statements purportedly for the purpose of explaining what he did next in his investigation. The State asked Agent Jackson, "[T]ell us very simply what Dr. Mueller stated while he was observing this condition at the point where the tone of the autopsy changed, that changed your investigation?" Agent Jackson replied, "Dr. Mueller pointed to multiple areas of hemorrhaged blood in the middle of Kathryn's neck and said, 'This is troubling.' He said it repeatedly." As explained above, the State continually utilized Dr. Mueller's troubling statements throughout the trial to support its theory that Laird incapacitated Kathryn before dragging her down the embankment and drowning her in the afterbay. See supra ¶¶ 73-80.
¶104 After considering the circumstances surrounding Dr. Mueller's "troubling" statements, we can come to no other conclusion but that the statements' primary purpose was to create an out-of-court substitute for trial testimony. First, there was no ongoing emergency to address when Dr. Mueller made the statements-Kathryn was already dead and an investigation into the circumstances surrounding her death had ensued. Further, the circumstances in which Dr. Mueller made the statements were sufficiently formal-he was performing an autopsy at the request of law enforcement and methodically noting the state of Kathryn's postmortem body while law enforcement officers observed. Just because Dr. Mueller did not make his statements under oath or memorialize them into a sworn writing does not render them too informal to qualify as testimonial. See Bullcoming , 564 U.S. at 664, 131 S. Ct. at 2717 ; Crawford , 541 U.S. at 52, 124 S. Ct. at 1364 ("The statements are not sworn testimony, but the absence of oath was not dispositive.").
¶105 Dr. Mueller's "troubling" statements at issue in this case are completely distinguishable from the nontestimonial statements in Porter . Unlike in Porter , where a law enforcement officer did not ***67 participate in the medical exam, here, Dr. Mueller performed his autopsy accompanied by two detectives and a coroner. In Porter , Michelle made her statements to a doctor, while here Dr. Mueller made his statements to Agent Jackson, another detective, and the coroner. The detectives and coroner were individuals "principally charged with uncovering and prosecuting criminal behavior"-Agent Jackson testified that he only sought authorization for the autopsy after he spoke with Laird and determined he needed to further investigate the circumstances surrounding *442 Kathryn's death, and Bullis testified that one of his objectives as coroner was to, if possible, figure out how Kathryn died. See Porter , ¶ 19 ; Clark , 576 U.S. at ----, 135 S. Ct. at 2182.
¶106 It is also important to note that Dr. Mueller's "troubling" statements contained his opinion . He was not simply commenting that Kathryn had bruising on her neck. He was stating his opinion, to law enforcement officers actively investigating the circumstances surrounding Kathryn's death, that the bruising on Kathryn's neck was "troubling." That type of opinion statement is functionally identical to any live, in-court testimony the State would have elicited from Dr. Mueller on direct examination, just like how the certificates at issue in Melendez-Diaz were functionally identical to live, in-court testimony that a witness would have given on direct examination. The State utilized Dr. Mueller's "troubling" statements as a substitute for Dr. Mueller's testimony at trial, using the statements "for the purpose of establishing or proving" that Kathryn's neck bruising was "troubling"-i.e., that her death was not the result of an accident or suicide. See Melendez-Diaz , 557 U.S. at 310, 129 S. Ct. at 2532 ; supra ¶¶ 73-80. Dr. Mueller had multiple, more general objectives in performing the autopsy, but his "troubling" statements served as specific commentary regarding his opinion of Kathryn's injuries; the statements' primary purpose was to create an out-of-court substitute for trial testimony. The State elicited and then utilized those statements as substitute for Dr. Mueller's testimony at trial. We accordingly conclude Dr. Mueller's "troubling" statements were testimonial hearsay and, therefore, subject to the Confrontation Clause's limitations.
¶107 The Confrontation Clause prohibits the admission of a testimonial hearsay statement unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. Clark , 576 U.S. at ----, 135 S. Ct. at 2179 ; Crawford , 541 U.S. at 59, 68, 124 S. Ct. at 1369, 1374. In this case, the State admitted Dr. Mueller's "troubling" statements against Laird even though Laird had no prior ***68 opportunity to cross-examine Dr. Mueller. "That alone is sufficient to make out a violation of the Sixth Amendment.... Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." See Crawford , 541 U.S. at 68-69, 124 S. Ct. at 1374.
¶108 We further note that, like in Melendez-Diaz , where the Supreme Court reasoned the certificates were not admissible under a hearsay exception because they were testimonial hearsay, Dr. Mueller's "troubling" statements are similarly not admissible under the present-sense impression hearsay exception because they are testimonial hearsay. While Dr. Mueller made his "troubling" statements contemporaneously with his observations of Kathryn's neck bruising, the statements were testimonial. Even if Dr. Mueller's "troubling" statements fell under the present-sense impression hearsay exception, admitting the statements violated Laird's constitutional right to be confronted with the witnesses against him. Because admission of Dr. Mueller's "troubling" statements violated Laird's Sixth Amendment confrontation rights, we conclude Laird is entitled to a new trial.
¶109 The State urges us to find harmless any error in admitting Dr. Mueller's "troubling" statements. The State cites § 46-20-701(1), MCA, which provides, "A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." The State argues the statements were not prejudicial because Agent Jackson was at the autopsy and observed the same things Dr. Mueller observed. We disagree. As explained above, considering how the State utilized the statements throughout the trial and in its closing statements, Dr. Mueller's "troubling" statements were undoubtedly accusatory and, therefore, prejudicial to Laird. Admission of the statements violated Laird's right to confront witnesses the State presented against him. We therefore reverse Laird's conviction and remand the case to the District Court for further proceedings consistent with this Opinion.
*443 ¶110 The State further argues any error in admitting Dr. Mueller's "troubling" statements was harmless because Laird was able to present Dr. Bennett's testimony, without contradiction from another medical doctor, that Kathryn's death resulted from drowning. The State argues Dr. Bennett's testimony was strong evidence presented in Laird's defense, which undermined its theory that Laird incapacitated Kathryn and then placed her body in the afterbay. During the State's cross-examination of Dr. Bennett, the District Court ***69 permitted it to perform a limited challenge to Dr. Bennett's credibility, and the State stayed within those parameters as it questioned Dr. Bennett. See supra ¶ 38. However, in its closing argument, the State inaccurately characterized the testimony produced at trial. In closing, the State argued:
So before this prosecution was commenced in 2014, [Dr. Bennett] used the terms "strangulation" and "throttling" to connect the hemorrhaging seen in the interior of Kathryn Laird's neck with the events leading up to her being drowned in the afterbay. Now, however, in 2016, he says the exact opposite. What has changed? Well, in 2015, he was terminated as an assistant state medical examiner at the direction of ... the attorney general's office. You should totally disregard Dr. Bennett's new opinion.
The State's characterization that the attorney general's office "terminated" Dr. Bennett is not supported by the evidence and went beyond the parameters the District Court set when it allowed the State to challenge Dr. Bennett's credibility. By improperly characterizing the evidence in its closing statement, the State undercut Dr. Bennett's testimony that Kathryn's neck bruising could have resulted from the drowning, embalming, or autopsy processes. When the State told the jury Dr. Bennett was "terminated" during its closing argument, it undermined a crucial defense witness's testimony and, consequently, undermined Laird's entire defense. See State v. Cunningham , 2018 MT 56, ¶¶ 24, 26, 390 Mont. 408, 414 P.3d 289 (explaining that jurors may attribute significant weight to expert medical testimony). Because Dr. Bennett's credibility was inappropriately challenged when the State explained the attorney general's office "terminated" Dr. Bennett in its closing argument, we conclude Dr. Bennett's testimony does not render the error in admitting Dr. Mueller's "troubling" statements harmless.
¶111 Laird asserts a second evidentiary issue on appeal. He argues the District Court abused its discretion by permitting the State to admit autopsy photographs through Agent Jackson. He argues that, because the State did not have an expert testify about Kathryn's bruises, the photographs were misleading and more prejudicial than probative. Kathryn's body was embalmed before the autopsy photographs were taken, and both Bullis and Dr. Bennett testified that embalming often causes bruises to appear darker.
¶112 This Court consistently reasons that photographs of instructive value are relevant and admissible, provided their probative value is not substantially outweighed by the danger of unfair prejudice. See, e.g. , State v. Dunfee , 2005 MT 147, ¶ 26, 327 Mont. 335, 114 P.3d 217. The State explains that the autopsy photographs were admissible ***70 to establish Kathryn's injuries, explain and apply the evidence, and assist the jury in understanding the case. While we do not necessarily disagree with the State's reasoning, we also note that the State utilized the photographs as part of its strategy to make Kathryn's "unexplained" bruises seem "troubling" while not providing any expert medical testimony to prove as much. Because we reversed Laird's conviction based on Dr. Mueller's "troubling" statements, we decline to decide whether the District Court abused its discretion by admitting the autopsy photographs. On remand, the District Court may consider the photographs' probative value compared with the danger of unfair prejudice in the context of the State's proffered evidence, and determine at that time whether or not to admit the photographs.
CONCLUSION
¶113 We conclude the fifteen-year preaccusation delay did not unconstitutionally prejudice Laird and determine the State presented sufficient evidence in its case-in-chief to overcome Laird's motion to dismiss for insufficient *444 evidence. We further conclude, however, that the State utilized Dr. Mueller's "troubling" statements for the truth of the matter they asserted. The statements were, therefore, inadmissible hearsay, and we must conclude, based on the record as it exists before us, the District Court abused its discretion by allowing Dr. Mueller's "troubling" statements into evidence. We reverse Laird's conviction and remand the case to the District Court for further proceedings consistent with this Opinion.
We concur:
MIKE McGRATH, C.J.

In 2018, a majority of the Justices declined to review a Confrontation Clause issue in Stuart v. Alabama , 586 U.S. ----, 139 S. Ct. 36, 202 L.Ed.2d 414 (2018) (denying the defendant's petition for a writ of certiorari). Justices Gorsuch and Sotomayor, however, would have accepted the petition to provide some clarity following the Court's fractured Williams decision. Stuart , 586 U.S. at ----, 139 S. Ct. at 36-37 (Gorsuch, J., dissenting from the denial of certiorari).