FILED

06/29/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0188

DA 20-0188

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 157

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BRANDON MICHAEL BAILEY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
                  In and For the County of Lewis and Clark, Cause No. BDC-2019-557-JA
                  Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Jeremy S. Yellin, Attorney at Law, Havre, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Michael P. Dougherty, Assistant Attorney General, Helena, Montana

            Leo Gallagher, Lewis and Clark County Attorney, Josh Nemeth, Deputy County Attorney, Helena, Montana

                    Submitted on Briefs:  June 16, 2021

                           Decided:  June 29, 2021

Filed:

                            _____
                                      Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    Brandon Michael Bailey appeals a First Judicial District Court order affirming his jury conviction for driving with a blood alcohol concentration exceeding the legal limit. Bailey argues that the Justice Court should have suppressed evidence stemming from the stop of his vehicle because the Montana Highway Patrol trooper unlawfully seized him, subjected him to a custodial interrogation without first issuing a *Miranda* warning, and lacked particularized suspicion to investigate whether Bailey was driving under the influence of alcohol ("DUI").  He also argues that the Justice Court improperly allowed a State witness to appear by two-way video at trial.  We affirm the denial of Bailey's motion to suppress but reverse his conviction because Bailey was denied his confrontation rights. As we remand for a new trial, we do not reach Bailey's additional argument regarding jury selection.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2    At approximately 6:16 p.m. on December 1, 2018, Montana Highway Patrol Trooper Griffin Sutherland responded to a reported single-vehicle rollover crash on Mountain Meadows Road near Helena. The person reporting the crash stated the vehicle had rolled over on its side and there were several cans of beer on the ground near the vehicle.

¶3    Trooper Sutherland drove to the scene, traveling eastbound on Mountain Meadows Road.  He testified that the weather was cold with a slight breeze and that it was dark.  The road was remote, did not appear to be heavily trafficked, and was not well-maintained.  He noted that the road was covered with ice and snow and had several ruts, which he believed

2

were caused by ice thawing and freezing over, but that the overall terrain was fairly level and he did not notice any steep ditches in the area.

¶4    When he neared the reported crash site, Trooper Sutherland observed a Toyota 4Runner driving toward him from the opposite direction. The vehicle matched the informant's description, and he observed fresh damage to the driver's side, including the mirror hanging down from the car, damage to the front fender near the driver's side door, and damage to the driver's side door itself. Trooper Sutherland suspected that the vehicle had been involved in the crash. He activated his lights, the vehicle stopped, and the driver, Bailey, got out. Bailey told Trooper Sutherland that he had been driving near the shoulder of the road at around two miles per hour to avoid the ruts and potholes in the road when his vehicle got "sucked into" the shoulder and tipped over on its side.

¶5    Trooper Sutherland believed, based on the dynamics of the crash, that Bailey had been traveling westbound in the eastbound lane in order to avoid the ruts and potholes in the road. Trooper Sutherland was suspicious of Bailey's explanation of the accident because, based on his experience investigating crashes and his observations of the conditions, he did not believe a vehicle could have tipped over while moving two miles per hour. He stated, "it would have taken a good attempt to try to roll a vehicle onto its side like that, without having any really extensive drop off next to the roadway." Trooper Sutherland was concerned that Bailey may have been impaired based on the reported beer cans near the crashed vehicle and Bailey's having left the scene of the crash before being released by law enforcement. He testified that he was still investigating at this point whether a traffic violation had occurred, such as reckless or careless driving.

3

¶6 Trooper Sutherland asked Bailey to sit in the back of his patrol vehicle. He did not handcuff Bailey or tell Bailey he was under arrest. Trooper Sutherland testified that he asked Bailey to sit in the patrol vehicle because: (1) he was still investigating the crash and needed to ask Bailey questions for the crash investigation report, which he could more conveniently do within the patrol vehicle where there was a computer system in which he could directly type out Bailey's answers; (2) it was cold and he did not want either Bailey or himself sitting outside while he asked questions about the crash; and (3) he was concerned that Bailey may be impaired, and having him sit in the backseat of the patrol vehicle would make it easier to detect any odor of alcohol. Regarding the third reason, however, Trooper Sutherland testified that, "[g]iven the timing of that, given the location, the weather conditions, I still would have asked [Bailey] to sit in the backseat of the car. I'm from Florida, so when the temperature gets low I get cold." Trooper Sutherland explained that he knew his questioning of Bailey regarding the crash investigation would take longer than normal because the car had been removed from the crash site, requiring him to rely on Bailey's answers rather than on his own observations; and, consistent with his training, he was not wearing his jacket at this point of the encounter in order to have easy access to his belt. His concern about the cold thus was for his own health and safety in addition to Bailey's.

¶7 While in the patrol vehicle, Bailey told Trooper Sutherland that, after the accident, he called his wife right away, he received a ride to his brother-in-law's house from a passer-by, and his brother-in-law drove him back to his car and helped him flip his vehicle back over. Trooper Sutherland inquired why Bailey did not attempt to contact

4

law enforcement before leaving the accident; Bailey responded that he did not have cell service. Trooper Sutherland reminded Bailey that he said he had called his wife right away; Bailey responded that he actually had called his wife after he arrived at his brother-in-law's house. Trooper Sutherland testified that he repeatedly told Bailey that he was trying to get Bailey on his way as soon as possible.

¶8 Trooper Sutherland detected the odor of alcohol coming from Bailey's breath during this conversation. He also observed that Bailey's eyes were "bloodshot" and "watery." He asked Bailey if he had consumed alcohol that night. Bailey replied that he had consumed two beers earlier in the evening. Trooper Sutherland then told Bailey, "[t]he reason why I'm asking is because I'm catching a whiff of alcohol coming through your gum whenever I talk to you. The reason why I put you in the backseat is so I can have the opportunity to smell it as you were talking to me." Trooper Sutherland asked Bailey about a sweatshirt he saw in the vehicle that was covering something. Bailey replied that there were "alcoholic beverage containers" under it. Bailey was in the backseat of the patrol vehicle for about fourteen minutes.

¶9 After another officer arrived and Trooper Sutherland had completed most of his crash report, he switched the focus of his inquiry to a DUI investigation. Trooper Sutherland had Bailey perform two field sobriety tests: the one-leg stand test and the horizontal gaze nystagmus ("HGN") test.[1] Trooper Sutherland observed one out of four indicators of impairment on the one-leg stand test and four out of six indicators of

---

[1] Trooper Sutherland did not have Bailey perform the "walk-and-turn" test because of the conditions outside.

impairment during the HGN test. Trooper Sutherland then requested that Bailey provide a preliminary breath sample. The breath sample tested positive for the presence of alcohol. Trooper Sutherland then placed Bailey under arrest for DUI and requested that he submit to a blood test.[2] About two hours after the initial encounter with Trooper Sutherland, Bailey provided a blood sample showing a blood alcohol concentration ("BAC") of approximately 0.112 GM/100 ML.

¶10 Later that day, the State charged Bailey in the Justice Court with DUI in violation of § 61-8-401(1)(a), MCA, or, in the alternative, operating a noncommercial vehicle with an alcohol concentration of 0.08 percent or greater in violation of § 61-8-406(1)(a), MCA. On January 4, 2019, Bailey filed a motion to suppress and dismiss. He argued that Trooper Sutherland unlawfully seized him, subjected him to a custodial interrogation without first advising him of his *Miranda*[3] rights, and did not have sufficient particularized suspicion to expand the crash investigation into a DUI investigation. After a hearing, the Justice Court denied the motion.

¶11 The State moved the Justice Court to allow Eric Miller—the State Crime Lab toxicologist who conducted the BAC toxicology tests on Bailey's blood and prepared the toxicology report—to testify at trial via Skype audio/video conferencing. The State acknowledged that Miller's testimony was material but argued that requiring him to travel from Missoula to Helena for brief testimony would be impracticable due to distance,

---

[2] Bailey testified that he asked for the blood test because he was confident it would show that his blood alcohol content was below the legal limit.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

expense, and timing. It also argued that Miller's trip would be impracticable given the backlog of work facing the Crime Lab. Bailey objected, arguing that it would violate his constitutional right to confront testimonial witnesses under Article II, Section 24, of the Montana Constitution and the Sixth Amendment to the United States Constitution. The court granted the State's motion, explaining that it regularly allows State toxicologists to testify by video to aid the Crime Lab and hasten adjudication of the cases before it.

¶12 The court held a jury trial on May 23, 2019. Montana Highway Patrol Trooper Brian Inman testified as a Drug Recognition Expert. He testified to the effects of alcohol on a person's body and a person's ability to operate a motor vehicle safely, and he described in detail the three standardized field sobriety tests. Trooper Inman said that he had reviewed the video of Trooper Sutherland administering the HGN test and that to the best of his knowledge Trooper Sutherland appeared to administer the test according to the standards of his training.

¶13 Trooper Sutherland testified to the events of the crash and his investigation and explained his training and experience in detecting impaired drivers, administering field sobriety tests, and investigating DUIs, which he has done over one hundred times during his career.

¶14 Miller testified via Skype audio/video conferencing. He was sworn in, the jury could see and hear him, Bailey could see and hear him, and both parties examined him in real time. He testified to his qualifications, the Crime Lab's procedures and methods for testing blood samples, and the content of Bailey's toxicology report. A copy of the report

7

was admitted into evidence without objection. Miller testified that Bailey's BAC measured approximately 0.112 GM/100 ML.

¶15 Bailey also testified at trial. He admitted to drinking alcohol on the day of the crash and stated that he had consumed approximately two to three beers. He stated that he probably had breakfast that day but did not know if he had lunch. Bailey denied that he was under the influence of alcohol at the time of the crash.

¶16 The jury convicted Bailey of operating a noncommercial vehicle with an alcohol concentration of 0.08 percent or greater. It acquitted him of the alternative DUI charge. The Justice Court sentenced Bailey to 180 days in jail, all suspended. Bailey appealed his conviction to the District Court, arguing the same theories as he does here. The District Court affirmed the Justice Court on both issues.

## STANDARDS OF REVIEW

¶17 This Court reviews de novo an appeal that originated in a justice court of record, as if the justice court ruling were appealed directly without district court review. *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 8, 391 Mont. 457, 419 P.3d 1208 (citations omitted); *State v. Maile*, 2017 MT 154, ¶ 7, 388 Mont. 33, 396 P.3d 1270 (citations omitted). We also review de novo a trial court's conclusions of law and constitutional interpretations. *City of Missoula v. Girard*, 2013 MT 168, ¶ 10, 370 Mont. 443, 303 P.3d 1283 (citations omitted); *State v. Stock*, 2011 MT 131, ¶ 16, 361 Mont. 1, 256 P.3d 899 (citation omitted).

¶18 We independently review a trial court's denial of a motion to suppress evidence to determine whether the trial court's findings of fact are clearly erroneous and whether its

conclusions of law are correct. *Kroschel*, ¶ 8 (citations omitted); *State v. Foster*, 2017 MT 118, ¶ 6, 387 Mont. 402, 394 P.3d 916. "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court has a definite or firm conviction that the trial court committed a mistake." *Maile*, ¶ 8 (citation omitted).

## DISCUSSION

¶19    *1. Whether the Justice Court correctly denied Bailey's motion to suppress.*

¶20    The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution prohibit unreasonable searches and seizures. The purpose of these provisions is "not to eliminate all contact between the police and citizenry," but rather "to prevent arbitrary and oppressive" government interference with individual privacy and security. *United States v. Mendenhall*, 446 U.S. 544, 553-54, 100 S. Ct. 1870, 1877 (1980) (internal quotation marks omitted); *see also State v. Clayton*, 2002 MT 67, ¶ 11, 309 Mont. 215, 45 P.3d 30; *State v. Wilkins*, 2009 MT 99, ¶ 8, 350 Mont. 96, 205 P.3d 795 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)). Because of these protections, "government searches and seizures must generally occur pursuant to a judicial warrant issued on probable cause." *Kroschel*, ¶ 10 (citations omitted).

¶21    A temporary investigative stop is a recognized exception to the warrant requirement. *Kroschel*, ¶ 11 (citing §§ 46-5-401, -403, MCA).

> Under this exception, a law enforcement officer may briefly stop and detain a person for investigative purposes without a warrant or probable cause for an arrest if, based on specific and articulable facts known to the officer, including rational inferences therefrom based on the officer's training and

9

experience, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or about to engage, in criminal activity.

*Kroschel*, ¶ 11 (emphasis and citations omitted). Such a stop may last only as long as is reasonably necessary to confirm or dispel the predicate suspicion for the stop, and law enforcement's means of detainment and investigative questions may not exceed the scope of the predicate suspicion for the stop. *Kroschel*, ¶¶ 13-14 (citations omitted). If a law enforcement officer's investigation exceeds the scope of the stop, the seizure may be deemed unreasonable. When an unreasonable search or seizure has occurred, the exclusionary rule bars the admission of the resulting evidence. *Kroschel*, ¶ 36; *State v. Ottwell*, 239 Mont. 150, 154, 779 P.2d 500, 502 (1989) (explaining that the exclusionary rule bars all resulting evidence as "fruit of the poisonous tree"). During the stop, however, additional objective data of wrongdoing "may give rise to further suspicions and enlarge the scope of the investigation." *State v. Hurlbert*, 2009 MT 221, ¶ 21, 351 Mont. 316, 211 P.3d 869 (citation omitted); *see State v. Allen*, 1998 MT 293, ¶ 12, 292 Mont. 1, 970 P.2d 81.

¶22 Particularized suspicion to conduct a DUI investigation exists when there is "(1) objective data from which an experienced officer ha[s] sufficient cause to conduct the field sobriety tests, and (2) a resulting suspicion that the person to be so tested has been driving under the influence of alcohol or drugs." *Bramble v. State*, 1999 MT 132, ¶ 23, 294 Mont. 501, 982 P.2d 464 (citing *Hulse v. State*, 1998 MT 108, ¶ 12, 289 Mont. 1, 961 P.2d 75). "Particularized suspicion does not require certainty; it depends on the totality of the circumstances in which the officer is making the determination," considering

"the quantity or content of the information available to the officer and the quality or degree of reliability of that information." *City of Helena v. Brown*, 2017 MT 248, ¶ 10, 389 Mont. 63, 403 P.3d 341 (citations omitted); *City of Missoula v. Moore*, 2011 MT 61, ¶ 16, 360 Mont. 22, 251 P.3d 679 (citing *State v. Rutherford*, 2009 MT 154, ¶ 12, 350 Mont. 403, 208 P.3d 389). This analysis may consider factors such as "the time of day, the location of the stop, and the [individual's] driving behavior." *Weer v. State*, 2010 MT 232, ¶ 10, 358 Mont. 130, 244 P.3d 311 (citations omitted).

¶23 *A. Whether Trooper Sutherland had sufficient particularized suspicion to expand the crash investigation into a DUI investigation.*

¶24 Bailey argues the Justice Court should have suppressed all inculpatory evidence, including but not limited to any statements against interest, the results of the field sobriety tests, any physical evidence observed or obtained from his vehicle, and the results of the BAC test. Bailey contends that Trooper Sutherland violated his right to be free from unreasonable searches and seizures because the trooper lacked the requisite particularized suspicion to expand his crash investigation into a DUI investigation. Bailey contends that, during the initial traffic stop and subsequent questioning, he demonstrated no signs of impairment that would give rise to independent particularized suspicion to expand the scope of the accident investigation into a DUI investigation and that his driving behavior had been appropriate for the poor road conditions. Bailey argues further that under § 46-5-401, MCA, Trooper Sutherland was required to inform him of his particularized

11

suspicion that Bailey was under the influence of alcohol prior to placing him in the patrol vehicle.[4]

¶25 The Justice Court concluded that "the totality of the circumstances and information available to the trooper lends ample suspicion that alcohol may have been a contributing factor in the crash and that the defendant was possibly impaired." Leading up to and during the course of the crash investigation, Trooper Sutherland became aware of additional, objective facts that gave rise to his suspicion that Bailey was impaired, including: the report that there was a rollover crash with beer cans near the scene; the object visible in the back seat of Bailey's vehicle concealed by a sweatshirt, which Bailey later said was alcohol; Trooper Sutherland's belief that Bailey's explanation of the rollover did not make sense based on the trooper's experience with car crashes; and the fact that Bailey was leaving the scene of the accident without contacting or being released by law enforcement. Even before Bailey sat in the patrol vehicle, Trooper Sutherland believed that Bailey may have been under the influence of alcohol. Trooper Sutherland's suspicions were then further aroused when, while Bailey was in the back seat, Trooper Sutherland detected the odor of alcohol coming from Bailey's breath and observed that Bailey's eyes were bloodshot and

---

[4] Section 46-5-401(1), MCA, states:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense. If the stop is for a violation under Title 61, unless emergency circumstances exist or the officer has reasonable cause to fear for the officer's own safety or for the public's safety, the officer shall as promptly as possible inform the person of the reason for the stop.

12

watery. When he inquired whether Bailey had consumed alcohol that evening, Bailey admitted that he had.

¶26 We agree with the Justice Court that, on this record, Trooper Sutherland was allowed to expand his initial investigation of the crash into a DUI investigation and perform field sobriety tests to confirm or dispel his escalating suspicions. *Hurlbert*, ¶ 34 (citing *State v. Elison*, 2000 MT 288, ¶ 32, 302 Mont. 228, 14 P.3d 456) (law enforcement may ask a person a moderate number of questions to confirm or dispel his suspicions); *see Hulse*, ¶ 37 (recognizing that, if a law enforcement officer believes a person may be impaired, the best course of action to ensure public safety is to continue the investigation to determine whether the person is impaired). The Justice Court correctly concluded that there were articulable, objective facts supporting Trooper Sutherland's particularized suspicion that Bailey was operating his vehicle under the influence of alcohol and that Trooper Sutherland properly expanded the crash investigation into a DUI investigation.

¶27 *B. Whether Trooper Sutherland subjected Bailey to a custodial interrogation requiring a Miranda warning when he asked Bailey to sit in the patrol vehicle and inquired about possible alcohol consumption.*

¶28 Bailey argues that, even if Trooper Sutherland had sufficient particularized suspicion to expand the crash investigation into a DUI investigation, his detention of Bailey "evolved into a formal arrest when Trooper Sutherland placed Mr. Bailey in the back of his patrol vehicle for the purposes of conducting a custodial interrogation." He argues that Trooper Sutherland lacked probable cause for an arrest and failed to administer *Miranda* warnings before questioning him. Bailey maintains that Trooper Sutherland placed Bailey in custody when: he at no time informed Bailey he was free to leave, nor did he inform

13

Bailey he was under investigation for DUI before directing him to sit in the back of the patrol vehicle; he directed Bailey to sit in the patrol vehicle as an assertion of authority and a show of force because it restrained Bailey such that he would not have been able to exit the vehicle on his own accord; he positioned his vehicle in front of Bailey's vehicle in a way that would prevent Bailey from leaving; and he did not inform Bailey of his right to refuse to sit in the patrol vehicle. Bailey argues further that there was a show of force when multiple law enforcement officers eventually responded and were present during the roadside encounter.

¶29 Bailey additionally contends that Trooper Sutherland conducted a DUI-specific interrogation while they were seated in the patrol vehicle, as the officer intended to elicit an incriminating response from Bailey. Bailey points to one of Trooper Sutherland's stated purposes for placing Bailey in the patrol vehicle: to detect the odor of alcohol on Bailey's breath. Bailey argues that Trooper Sutherland's questioning thus exceeded the bounds associated with a "brief investigative encounter," and he was required to advise Bailey of his *Miranda* rights.

¶30 "Because a person is typically not free to leave until released by the investigating officer, a temporary investigative stop generally effects a Fourth Amendment seizure." *Kroschel*, ¶ 25 (citing *Berkemer v. McCarty*, 468 U.S. 420, 436-38, 104 S. Ct. 3138, 3148-49 (1984)).

> While both inherently coercive to a degree and a significant restriction on a person's freedom of action for the duration of the stop, a temporary investigative stop typically does not curtail a person's freedom of action to an extent or degree similar to a formal arrest due to the brief duration, limited

14

scope of permissible questioning, public or non-secluded setting, and expectation of imminent release typically associated with such a stop.

*Kroschel*, ¶ 25 (citing *Berkemer*, 468 U.S. at 436-38, 104 S. Ct. at 3148-49); *see also Elison*, ¶¶ 28, 33. As such, *Miranda* warnings are not required before routine questioning pursuant to an investigative stop. *State v. Larson*, 2010 MT 236, ¶ 30, 358 Mont. 156, 243 P.3d 1130 (quoting *Hurlbert*, ¶ 34; *Elison*, ¶ 29) ("law enforcement officers need not administer *Miranda* warnings to suspects during brief investigative encounters even if those encounters are somewhat coercive" given "the brevity of questioning and its public setting, even though few motorists would feel free to leave" (internal quotation marks omitted)); *Berkemer*, 468 U.S. at 437, 104 S. Ct. at 3148-49 ("Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.").

¶31 During routine traffic stops, "an officer may ask the detainee a moderate number of questions to determine the detainee's identity and to try to obtain information confirming or dispelling the officer's suspicions before the requirements of *Miranda* attach." *Larson*, ¶ 32 (quoting *Elison*, ¶ 32). An officer also may administer a field sobriety test without implicating *Miranda* so long as he does not additionally conduct an interrogation; "[t]he privilege against self-incrimination does not extend to real or objective evidence." *State v. Van Kirk*, 2001 MT 184, ¶ 22, 306 Mont. 215, 32 P.3d 735 (citation omitted);

15

*Larson*, ¶ 30 (citing *State v. Stanczak*, 2010 MT 106, ¶ 9, 356 Mont. 263, 232 P.3d 896));

*see also Berkemer*, 468 U.S. at 442, 104 S. Ct. at 3151-52 (holding that a person subjected

to only a traffic stop and field sobriety tests is not in custody for the purposes of *Miranda*).

¶32 "[T]he permissible non-custodial questioning incident to a temporary investigative

stop may nonetheless ripen into a custodial interrogation if the circumstances of the

detention and related questioning evolve to approximate the more coercive nature of an

incommunicado police interrogation incident to a formal arrest." *Kroschel*, ¶ 26 (citing

*Berkemer*, 468 U.S. at 440, 104 S. Ct. at 3150). When determining whether a person has

been taken into custody, "the ultimate inquiry is not whether a reasonable person would

feel free to leave, but rather whether there was a 'formal arrest or restraint on freedom of

movement' of the degree associated with a formal arrest." *Maile*, ¶ 12 (quoting

*Elison*, ¶ 28). "Interrogation includes any words or actions on the part of the police

(other than those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response from the suspect." *State v. Braulick*,

2015 MT 147, ¶ 16, 379 Mont. 302, 349 P.3d 508 (quoting *State v. Olson*, 2003 MT 61,

¶ 18, 314 Mont. 402, 66 P.3d 297) (internal quotation marks omitted).

¶33 We considered in *Larson*, *Elison*, and *Kroschel* whether investigative stops ripened

into custodial interrogations. In *Larson*, at the outset of a traffic stop the officer observed

the defendant slurring his words, speaking slowly, and experiencing delayed reaction times

when asked for his license and registration. *Larson*, ¶ 10. The officer inquired whether

the defendant had consumed any alcohol that evening; after receiving an affirmative

response, he requested the defendant exit the vehicle to perform field sobriety tests.

16

*Larson*, ¶ 10. We held that the investigation "remained public, routine, and temporary in nature," and that the officer's questions to Larson "were confined to the context of an ongoing DUI investigation," thus not implicating *Miranda*. *Larson*, ¶ 32 (citing *Elison*, ¶ 32). Similarly in *Elison*, ¶¶ 6-8, after an officer was informed of possible drug use, the officer initiated a traffic stop, immediately smelled the odor of marijuana, observed that the defendant "appeared nervous, his eyes were red and glassy, and he would not sit still." The officer frisked the defendant, asked about the pipe that had been reported, and asked whether there was marijuana in the truck. *Elison*, ¶ 9. We held that, even though the defendant was not free to leave, the circumstances did not implicate *Miranda* because his freedom of movement was not restrained to "the degree associated with formal arrest" and the officer's "questions were reasonably related to the reason for the stop and designed to dispel his particularized suspicion that Elison had been smoking marijuana[.]" *Elison*, ¶¶ 32-33. *See also Allen*, ¶¶ 5-6, 13 (where during a traffic stop the officer asked the defendant to exit his vehicle to discuss his license plate and then detected the odor of alcohol and asked the defendant if he had been drinking; we held that "[t]he stop was . . . public, routine, and temporary in nature," thereby "distinguish[ing] it from 'custodial' interrogations," even though the defendant was not free to leave).

¶34 In *Kroschel*, however, we held that the detainment escalated to a custodial interrogation implicating *Miranda*. There, after observing the underage defendant at a football game "unsteady on [her] feet" and being physically assisted to the restroom by a friend, the officer approached, detected the odor of alcohol, and asked the defendant for identification, which she did not have. *Kroschel*, ¶ 2. The officer asked for the defendant's

17

name and date of birth, to which the defendant twice provided incorrect information. *Kroschel*, ¶ 3. The officer suspected the defendant of the crime of Minor in Possession, and further pursued the requested information; the defendant was physically removed to multiple secluded locations and questioned and threatened with arrest by multiple law enforcement officers, who made it clear she would not be free to go until she complied with their requests. *Kroschel*, ¶¶ 4-6. We thus concluded the questioning implicated the circumstances contemplated in *Miranda*. *Kroschel*, ¶¶ 27, 31.

¶35     Citing § 61-7-109(3), MCA—allowing law enforcement to complete an accident investigation—the Justice Court concluded that Trooper Sutherland's temporary detention of Bailey did not escalate to a formal arrest:

> Trooper Sutherland was dispatched to the scene of a possible rollover accident, on a public way and as a matter of his status as a law enforcement officer was well within his right and obligation to stop the defendant, question him as to his possible involvement, inspect the recent damage of the defendant's vehicle and begin an accident investigation. Such an investigation, as part of the trooper's governmental function, required the trooper to investigate the cause, and record the information of the driver, occupants, vehicle identification and liability insurance. Trooper Sutherland was in close proximity to the defendant out of this responsibility during the investigation and did not seize him illegally. The [c]ourt is unaware of any requirement, rule or statute that prohibits the trooper from asking the defendant to sit in a patrol vehicle during this phase of crash investigation.

¶36      Section 61-7-109(3), MCA, states:

> A law enforcement officer who in the regular course of duty investigates a motor vehicle accident in which a person is killed or injured or in which damage to the property of a person exceeds $1,000, either at the time of and at the scene of the accident or after the accident by interviewing participants or witnesses, shall within 10 days after completing the investigation forward a written report of the accident to the department.

18

This statute authorized Trooper Sutherland to initiate an investigative stop and to temporarily detain Bailey for the purposes of investigating the reported accident. The record supports—and Bailey does not dispute—that Trooper Sutherland lawfully detained Bailey to investigate the crash based on his particularized suspicion that Bailey had committed a traffic code violation or was a witness to such activity. *See* §§ 61-7-109(3), 61-8-301(1)(a), -302(1), MCA; *State v. Marcial*, 2013 MT 242, ¶ 18, 371 Mont. 348, 308 P.3d 69.

¶37 We agree with the Justice Court that Trooper Sutherland's request of Bailey to sit in the patrol vehicle to answer his questions did not escalate the detention to the level of a formal arrest. Trooper Sutherland testified that the primary, determinative reason he asked Bailey to sit in his vehicle was to ensure Bailey's and his own safety given the time of day and the road and weather conditions. This is a valid reason to make such a request. *See Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015) (noting that an officer's mission during a traffic stop is to (1) "address the traffic violation that warranted the stop" and (2) "attend to related safety concerns"); *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S. Ct. 330, 333 (1977) (holding that any inconvenience to a driver in being asked to step out of his vehicle is outweighed by the public interest supported by allowing the practice—namely, officer and traffic safety); *accord Maryland v. Wilson*, 519 U.S. 408, 414-15, 117 S. Ct. 882, 886 (1997); *compare State v. Roy*, 2013 MT 51, ¶ 13, 369 Mont. 173, 296 P.3d 1169 (where this Court declined to apply the rule from *Mimms* and *Wilson* because the officer's rationale in asking the defendant to exit his vehicle was not due to an accepted public policy reason underlying

19

the *Mimms* rule, such as public or officer safety). Though Trooper Sutherland acknowledged that he requested Bailey to sit in the patrol vehicle in part to better determine whether Bailey had been drinking, Trooper Sutherland still was acting within the confines of an investigative stop and attempting to confirm or dispel his suspicions. *See Berkemer*, 468 U.S. at 441-42, 104 S. Ct. at 3151 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). There were objectively reasonable factors that led to Trooper Sutherland's request to have Bailey answer his questions from the back seat of the vehicle, and that temporary detention did not alone manifest an arrest.

¶38 The Justice Court also correctly concluded that Trooper Sutherland's questioning of Bailey did not implicate *Miranda*. It noted that, "although ask[ed] to remain [on site] while the trooper completed his governmental function of crash investigation, [Bailey] was not under arrest or in custody for any crime, was not handcuffed or questioned about any particular offense, but only the information required by the trooper to satisfy the crash investigation." Like in *Elison* and *Larson*, Trooper Sutherland's questions were "public, routine, and temporary in nature," and they remained confined to the context of his escalating suspicions of Bailey's alcohol consumption. Trooper Sutherland never told Bailey he was not free to leave or that he was under arrest, nor did he handcuff Bailey or use any show of force to coerce Bailey into his vehicle. Unlike in *Kroschel*, where the only possible purpose of moving the defendant to secluded locations and having multiple officers question her was to gain the information the officers wanted, Bailey testified that

20

Trooper Sutherland was "very professional," that he "knew [Trooper Sutherland] was doing his job," and that Bailey was "completely comfortable with everything." Trooper Sutherland did not inquire about any particular offense, asking only about information directly related to the crash investigation or his escalating suspicions that Bailey may have been under the influence of alcohol. These facts are consistent with those of an investigative stop and did not implicate *Miranda*. *See Larson*, ¶ 32.

¶39 The Justice Court correctly concluded that Trooper Sutherland lawfully detained Bailey for the purpose of completing his crash investigation and that the detention did not amount to a formal arrest. Based on the foregoing conclusions, we affirm the Justice Court's denial of Bailey's motion to suppress.

¶40 *2. Whether the Justice Court violated Bailey's right to confrontation when it allowed Miller to testify via two-way video.*

¶41 "In all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face[.]" Mont. Const. art. II, § 24; *see* U.S. Const. amend. VI. A criminal defendant's right to confrontation guarantees the right to fully cross-examine testimonial witnesses. *Stock*, ¶ 29. Cross-examination is an essential function in our justice system because it assists in the production of truth; confrontation "ensur[es] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *State v. Mercier*, 2021 MT 12, ¶ 16, 403 Mont. 34, 479 P.3d 967 (quoting *Maryland v. Craig*, 497 U.S. 836, 846, 110 S. Ct. 3157, 3163 (1990)).

21

¶42 Under Montana's confrontation clause, a witness may testify via two-way video only when the "moving party makes an adequate showing on the record that the personal presence of the witness is impossible or impracticable to secure due to considerations of distance or expense." *City of Missoula v. Duane*, 2015 MT 232, ¶ 25, 380 Mont. 290, 355 P.3d 729. After Bailey's trial, this Court clarified in *Mercier*, ¶ 20 (quoting *Craig*, 497 U.S. at 850, 110 S. Ct. at 3166), that the showing of "impossibility" or "impracticability" does not obviate the State's burden to also sufficiently demonstrate that dispensing with literal face-to-face confrontation would be "necessary to further an important public policy." Judicial economy, standing alone, does not satisfy the constitutional requirement that a defendant's right to in-person confrontation at trial may be replaced by testimony via two-way video. *Mercier*, ¶ 26.[5]

¶43 In granting the State's motion to allow Miller to appear via Skype, the Justice Court stated that Miller lives and works in Missoula and thus

> would be required to spend the entire [workday] travelling to Helena and waiting to testify in this matter, before returning home after a brief testimony. This [c]ourt is well aware of the continuing backlog of work facing the State Crime Lab at this time. With the State's forensic scientists being subpoenaed nearly daily in courts around the State, permission for

---

[5] In *Mercier*, a majority of the Court agreed that *Craig*'s two-prong test of "necessity" and "reliability" applies to cases involving two-way video. Two members reasoned that *Duane*'s "impossibility or impracticability" standard did not supplant a showing that the use of such technology is "necessary to further an important public policy." *Mercier*, ¶¶ 20, 22. Three others would have overruled or clarified *Duane* "to eliminate its conclusion or suggestion that prohibitive expense forms the basis of necessity and to eliminate its conclusion or suggestion that *Craig*'s necessity requirement is replaced with or includes an impracticality standard." *Mercier*, ¶ 41 (Gustafson, J., specially concurring and dissenting). Irrespective of these differences, the majority agreed that "generalized judicial economy," of the sort the Justice Court invoked in this case, was an insufficient basis to allow two-way video testimony and "must yield to the constitutional rights of the accused." *Mercier*, ¶ 26; *Mercier*, ¶ 41 (Gustafson, J., specially concurring and dissenting, noting that "expense is not a justification for a constitutional shortcut").

22

Mr. Miller's video testimony is the only practicable solution to allow the Crime Lab to continue its work, in turn facilitating the efficiency of this court and statewide criminal prosecutions in general.

¶44 Bailey argues the State failed to sufficiently demonstrate that Miller's travel from Missoula to Helena to testify at the trial in person would impose prohibitive expense on the State or a significant burden on Miller. He contends that the Justice Court's reasoning for granting the State's motion was insufficient because it was based merely on its regular practice of allowing witnesses from the Crime Lab to appear by video and for judicial economy.

¶45 The State concedes that *Mercier* renders erroneous the Justice Court's decision to allow Miller to testify via two-way video. Although the court did not have the benefit of our decision at the time, we agree that *Mercier* is on point. Because Miller was a testimonial witness, the State could not have him appear by video without a proper showing that Miller's testimony was necessary to further an important public policy aside from judicial economy. *Mercier*, ¶¶ 20, 26.[6] The State provided only vague and unverified claims of the burden Miller's testimony may cause to his or the Crime Lab's work. Allowing the Skype testimony violated Bailey's constitutional right to confrontation.

¶46 The State argues, however, that the error was harmless. "A constitutional deprivation of the defendant's confrontation right is a trial error and is subject to harmless error review." *Mercier*, ¶ 31 (citation omitted). The State bears the burden of proving beyond a reasonable doubt that the error was harmless. *Mercier*, ¶ 31 (citation omitted).

---

[6] The Dissent raises a hypothetical set of unusual circumstances that go well beyond "generalized judicial economy." Dissent, ¶ 54. We limit our decision to the facts of this case.

23

We consider under this analysis "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, and the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." *Mercier*, ¶ 31 (citation and internal punctuation marks omitted). We "look[] not to the quantitative effect of other admissible evidence, but rather to whether the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence proved." *Mercier*, ¶ 31 (citing *Van Kirk*, ¶ 43; emphasis omitted). We recognized in *Van Kirk*, ¶ 45, that:

> there will be cases in which there was no other admissible evidence proving the same facts that the tainted evidence proved, making the burden of producing cumulative evidence of the fact impossible. Clearly, if the only evidence tending to prove an element of the crime is tainted, then reversal will be compelled.

¶47 The State argues that the jury was presented with cumulative evidence that proved the same facts as the tainted evidence—that Bailey's BAC exceeded the legal limit. It points to Trooper Inman's testimony that a person's BAC would be beyond the legal limit if he displayed four out of six indicators of impairment on a HGN test; Trooper Sutherland's testimony that Bailey displayed four out of six indicators of impairment during the HGN test; and Bailey's admission that he had consumed alcohol before driving.

¶48 This evidence does not satisfy the State's harmless error burden. Recall that the jury acquitted Bailey of DUI and convicted him of the *per se* offense. Testimony regarding Bailey's HGN test results, and even Bailey's admission to consuming alcohol, were not cumulative of Miller's testimony or the forensic test results. No other testimony proved

24

Bailey's BAC—an element of § 61-8-406(1)(a), MCA, the statute Bailey was convicted of violating. That statute explicitly identifies the accepted methods of BAC analysis: "analysis of the person's blood, breath, or urine." Section 61-8-406(1)(a), MCA; *see also* Admin. R. M. 23.4.201–23.4.225 (defining and providing the scientific protocols for BAC analyses). Miller's testimony was the only evidence presented that could prove that Bailey's BAC exceeded the legal limit of 0.08 percent, without which the jury could not conclude that Bailey violated § 61-8-406(1)(a), MCA. *See Mercier*, ¶ 33; *compare State v. Weldele*, 2003 MT 117, ¶ 63, 315 Mont. 452, 69 P.3d 1162 (where we found harmless error because there was an additional test, separate from the tainted evidence, sufficient to establish the "under the influence" element of the charged crime).

¶49 The Justice Court thus improperly allowed the State's expert witness to testify via two-way video without an adequate showing that the video appearance was necessary to further an important public policy. We reverse the Justice Court's ruling on this issue and remand for a new trial consistent with this Opinion.[7]

**CONCLUSION**

¶50 The Justice Court correctly determined that Trooper Sutherland's initial temporary detention and subsequent DUI investigation both were based on sufficient particularized

---

[7] Bailey contends that this Court should remand the issue to the Justice Court with instructions to dismiss the case "to send a message to prosecutors and the judiciary that these types of constitutional violations must end" and because "[i]t is unjust and fundamentally unfair to subject Mr. Bailey and the taxpayers of this State to the time, expense, stress, and burden of another trial." Bailey provides no authority in support of his argument, and, as he notes, the remedy in such situations where a defendant's right to confrontation has been violated is to remand for a new trial. *See, e.g., State v. Laird*, 2019 MT 198, ¶ 113, 397 Mont. 29, 447 P.3d 416.

suspicion and that Bailey was not subjected to a custodial interrogation when he was detained in the back seat of the patrol vehicle. We accordingly affirm the Justice Court's denial of Bailey's motion to suppress. Because the Justice Court could not on this record constitutionally allow the State's expert witness to testify via two-way video, we reverse Bailey's conviction and remand the case for a new trial.

/S/ BETH BAKER

We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

Chief Justice Mike McGrath, dissenting.

¶51 I continue to contend that a showing of "necess[ity]" is not required by the Confrontation Clause for the use of modern two-way video communication technology. *See State v. Mercier*, 2021 MT 12, ¶¶ 42-51, 403 Mont. 34, 479 P.3d 967 (McGrath, C.J., specially concurring); *City of Missoula v. Duane*, 2015 MT 232, ¶¶ 27-31, 380 Mont. 290, 355 P.3d 729 (McGrath, C.J., concurring). Moreover, I believe that this Court should be guided by a careful analysis of the challenged technology and its effect on the Confrontation Clause's guiding principle—"reliability of the evidence against a criminal defendant"—rather than mechanically applying a standard ill-suited for this particular technological context. *Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct. 3157, 3163 (1990).

26

¶52 Today's majority Opinion adopts our recent *Mercier* plurality decision. In *Mercier,* the Court fractured into three separate opinions attempting to address this Court's precedent on the issue of two-way video testimony. The principal opinion in *Mercier*— signed by two justices—contended that this Court's *Duane* holding, which allowed the use of two-way video testimony upon the finding that in-person testimony would have been "impossible or impracticable," did not actually represent a departure from the "necess[ity]" standard *Craig* had articulated for the use of one-way video. *See Mercier*, ¶ 20 (citing *Duane*, ¶ 25). Five justices disagreed, believing that *Duane* appeared to fashion a new standard for two-way video testimony. *See Mercier*, ¶¶ 45-48 (McGrath, C.J., specially concurring); *Mercier*, ¶ 41 (Gustafson, J., specially concurring and dissenting). Three of these justices believed that *Duane* should be "clarif[ied] or overrul[ed]" to unambiguously adopt the *Craig* standard for two-way video, *see Mercier*, ¶ 41 (Gustafson, J., specially concurring and dissenting), while the remaining two justices argued that *Duane* rightly established a different standard for the technology. *See Mercier*, ¶¶ 45-48 (McGrath, C.J., specially concurring). Though a majority of justices in *Mercier* declined to apply the "impossible or impracticable" standard articulated in *Duane*, the Court's view on these matters appears far from settled. For this reason, I reiterate my prior contention that the *Craig* standard is inappropriate for the testimony by two-way video technology at issue in *Duane*, *Mercier*, and the present case.

¶53 The heightened "necess[ity]" standard adopted by the majority Opinion here originates from *Craig*, which deemed "necess[ity]" a proper requirement for the use of a particular technology—one-way video—that carried inherent reliability concerns. *Craig,*

2

497 U.S. at 850, 110 S. Ct. at 3166.  Importantly, the one-way video for testimony by child victims was explicitly intended to obscure a fundamental interest of the Confrontation Clause: the accuser's full awareness and perception of the accused.  *See Coy v. Iowa*, 487 U.S. 1012, 1019, 108 S. Ct. 2798, 2802 (1988) ("It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" (quoted by *Craig*, 497 U.S. at 846, 110 S. Ct. at 3164)); *see also Craig*, 497 U.S. at 845-46, 110 S. Ct. at 3163 (describing the role that formality, in the form of a courtroom oath, plays in "impressing [the witness] with the seriousness of the matter and guarding against the lie").

¶54    The two-way technology at issue here does not share this troubling purpose or effect.  It is designed to *facilitate*, rather than obscure, the transmission of essentially all of the same visual and auditory information that individuals can glean from one another through in-person interaction.[1]  In fact, it is not hard to foresee that such technology, which continues to improve, could transmit such information *more effectively* than unaided human sensory organs within a courtroom.  *See Duane,* ¶ 28 (McGrath, C.J., concurring) (noting that the "advances in communications technology that have far outstripped the average person's ability to foresee or even imagine have occurred at an astonishing pace"); *Mercier*, ¶ 44 (McGrath, C.J., specially concurring) (noting the uncontroversial use of eyeglasses and hearing aids to extend the range of failing human sensory organs in court proceedings).  Imagine a prosecuting witness who has become completely blind and deaf

---

[1] Moreover, this technology has proven itself quite capable at doing so over the course of the strain-test brought on by the past year's Covid-19 pandemic.

3

but whose senses can be temporarily restored to perfect working order when using a miraculous new medical device.[2] The only hitch: the device is not portable enough to use outside of the hospital setting. Would the interests protected by the Confrontation Clause be better served by physically bringing this blind and deaf witness to testify in a courtroom—unburdened by the perception of her surroundings—or by allowing her to testify from a physical distance, where the appropriate technology will force her to perceive the courtroom, bailiff, judge, jury, observers, and, importantly, the accused, all in exquisite detail?

¶55    The point is that the technological distinctions matter. A blind focus on physical proximity can come at the expense of a serious consideration of the constitutional reliability interests implicated by various forms of communication technology. Lest constitutional jurisprudence become little more than a gallery of historical artifacts and amusing oddities, courts must continue with the difficult task of holding new technologies up to the light of enduring constitutional principles.

¶56    I dissent.

/S/ MIKE McGRATH

---

[2] *See, e.g.,* Wayne Lewis, *Computer Model Fosters Potential Improvements to 'Bionic Eye' Technology,* Keck School of Medicine of USC (Apr. 9, 2021), https://perma.cc/RBJ9-722Q (last visited June 23, 2021) (describing advancements in technology that sends visual information to the brain, in the absence of a functioning natural eye, by stimulating retinal neurons with electrodes).